2011 UT App 141

**Debra BOYER, Petitioner and Appellant,**

v.

**Darren BOYER, Respondent and Appellee.**

No. 20100359–CA.

Court of Appeals of Utah.

May 5, 2011.

Kristopher K. Greenwood and Rand G. Lunceford, Ogden, for Appellant.

Christina L. Micken, Layton, for Appellee.

Before Judges DAVIS, VOROS, and CHRISTIANSEN.

## OPINION

DAVIS, Presiding Judge:

¶ 1 Debra Boyer (Wife) appeals the trial court's property distribution and alimony award in her divorce action against Darren Boyer (Husband). We affirm but remand for the trial court to clarify some aspects of the alimony award.

## BACKGROUND

¶ 2 Wife and Husband were married on July 10, 1993. During the marriage, Husband had an affair, which may have resulted in Wife contracting a sexually transmitted disease from Husband, requiring her to have a hysterectomy. Wife filed for divorce in March 2007.

¶ 3 During the marriage, Wife worked part time as a bookkeeper, earning $11.50 per hour. The trial court found that Wife was capable of securing "full-time employment at a rate at least equal to her current wage." The trial court therefore imputed to Wife a $1,993 gross monthly salary and estimated her net monthly income to be $1,594. Husband's income from his work as a stockbro-

ker and financial advisor was disputed. The trial court made detailed factual findings regarding Husband's income and ultimately concluded that his gross income was $110,000 per year, resulting in an estimated net monthly income of $6,600.

¶ 4 The trial court found that Wife had a reasonable monthly need of $4,967 and that Husband had a reasonable monthly need of $5,762. Taking into account Husband's $677 monthly child support obligation, the trial court determined that Wife had an unmet need of $2,696 per month and that Husband had a surplus of $161 per month.[1] The trial court awarded Wife alimony as follows:

> To equalize the parties' standard[s] of living, the Court orders [Husband] to pay [Wife] $1,428.00 in alimony each month for a period of five (5) years, commencing on July 1, 2008. Thereafter, the alimony is reduced to $1,000.00 per month on July 1, 2013, for another five (5) years and then the alimony is reduced to $800.00 per month until December 31, 2015, at which time the alimony shall terminate.

The trial court later explained that it was "of the opinion that a gradual diminution of alimony is equitable and gives [Wife] incentive along the way to improve her job skills and become increasingly self-sufficient."

¶ 5 The trial court also found that Husband had a partnership interest in a commercial building in Ogden. The trial court found the net value of Husband's interest to be $20,300 and awarded Husband the entire value of the interest.

¶ 6 The trial court found that the parties had almost $79,000 in marital credit card debt. Because Husband was concerned about how a bankruptcy might affect him professionally, the trial court ordered Husband to pay the entire amount of this debt. Husband was also ordered to pay between $60,000 and $125,000 [2] that the parties owed to Husband's brother.

---

1. Although the trial court's findings of fact actually stated that Husband had a shortfall of $217 per month, the trial court later acknowledged that finding to be incorrect and adjusted it. *See infra* ¶ 20.

2. The exact amount of this debt was unclear, but the trial court declined to make a finding as to the exact amount because, given the amount of the other marital debt Husband was ordered to pay and the fact that Husband had agreed to pay

¶ 7 Both parties acquired retirement accounts during the marriage. Wife's was valued at approximately $2,500, and Husband's was valued at approximately $12,500. The trial court awarded both parties their own retirement accounts.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 8 First, Wife objects to the trial court's property division. Specifically, she argues that she should have been awarded half of the parties' partnership interest in the commercial property and that the trial court should have divided the parties' retirement accounts equally between them.

We afford the trial court considerable latitude in adjusting financial and property interests, and its actions are entitled to a presumption of validity. Accordingly, changes will be made in a trial court's property division determination in a divorce action only if there was a misunderstanding or misapplication of the law resulting in substantial and prejudicial error, the evidence clearly preponderated against the findings, or such a serious inequity has resulted as to manifest a clear abuse of discretion.

*Davis v. Davis,* 2003 UT App 282, ¶ 8, 76 P.3d 716 (internal quotation marks omitted).

■ ¶ 9 Second, Wife challenges the trial court's alimony award on several grounds. Specifically, she argues that (1) the trial court failed to take into account Husband's fault and Wife's health in determining the appropriate amount of alimony and whether to award permanent alimony, (2) the trial court abused its discretion by fashioning a gradually decreasing alimony award, and (3) the trial court's order misstated the alimony termination date and the amount of alimony awarded. "Trial courts have considerable discretion in determining alimony ... and [determinations of alimony] will be upheld on appeal unless a clear and prejudicial abuse of

discretion is demonstrated." *Id.* ¶ 7 (alteration and omission in original) (internal quotation marks omitted).

## ANALYSIS

### I. Property Division

■ ¶ 10 In fashioning a divorce decree, trial courts are expected to make "equitable orders relating to ... property, debts or obligations." Utah Code Ann. § 30-3-5 (Supp. 2010). "The major purpose of a property division ... is to achieve a fair, just, and equitable result between the parties." *Haumont v. Haumont,* 793 P.2d 421, 424 (Utah Ct.App.1990) (internal quotation marks omitted). In light of that goal, a trial court attempting to make an equitable property distribution should engage in a four-step process, making findings of fact that are "sufficiently detailed" and that "include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Stonehocker v. Stonehocker,* 2008 UT App 11, ¶¶ 15–16, 176 P.3d 476 (internal quotation marks omitted). First, the trial court should distinguish between separate and marital property;[3] second, it should "consider whether there are exceptional circumstances that overcome the general presumption that marital property [should] be divided equally between the parties"; third, it should "assign values to each item of marital property"; and fourth, it should distribute the property in a manner consistent with its findings and "with a view toward allowing each party to go forward with his or her separate life." *Id.* ¶ 15. In carrying out this process, trial courts are not expected to view each item of marital property in isolation and divide each separately. Rather, the trial court is permitted to look at the martial property in its entirety and to apportion it in a manner that best facilitates "a clean break" between the parties and achieves a result that equitably divides the

---

it, the amount did not impact the trial court's ruling.

3. The term "marital property" in this context encompasses not only the assets of the parties, but their debts as well. *See* Utah Code Ann. § 30-3-5 (Supp.2010) (providing for equitable distribution of debts); *Stonehocker v. Stonehock-*

er, 2008 UT App 11, ¶ 15, 176 P.3d 476 (citing cases in identifying four-step process that address division of both assets and debts); *Black's Law Dictionary* 1338 (9th ed. 2009) ("A [marital] property settlement includes a division of the marital debts as well as assets.").

marital property as a whole. *See Gardner v. Gardner*, 748 P.2d 1076, 1079 (Utah 1988) (holding that the trial court could reapportion its distribution of some items of marital property to offset the award of other items of marital property to a single party); *Woodward v. Woodward*, 656 P.2d 431, 433 (Utah 1982) (holding that, where possible, division of one spouse's retirement benefits "may best be accomplished" by determining the other spouse's interest in those benefits and then satisfying that spouse's share out of other assets (internal quotation marks omitted)).

¶ 11 Wife's argument incorrectly characterizes the trial court's award of the entire interest in the commercial building and Husband's retirement account to Husband as an unequal distribution of property that must be justified by a specific finding of exceptional circumstances, *see Stonehocker*, 2008 UT App 11, ¶ 15, 176 P.3d 476. The unequal division of a single piece of marital property does not require a finding of exceptional circumstances where the division of the property as a whole is equitable. It was unnecessary for the trial court to justify its unequal distribution of the retirement accounts and the commercial building where it was apparent that the distribution was more than offset by the unequal division of the parties' considerable debts.[4] In fact, as the division of the assets and debts as a whole disfavored Husband, it was incumbent upon the trial court to make a finding explaining how exceptional circumstances justified *Husband's* unequal share, which the trial court did by observing that it made Husband responsible for the debt to decrease the likelihood of a bankruptcy, which could result in adverse professional consequences for Husband. The trial court further explained its rationale in dividing the martial property when it responded to Wife's objections to the proposed findings of fact and conclusions of law:

> True, [Husband] received his business value of $20,300 and his retirement of $12,500, compared to [Wife's] retirement of $2,500. However, he is assuming most of the marital debt.... Thus, while there is a disparity in the allocation of their personal property, it pales in comparison to the stress and responsibility, including mounting interest payments, [Husband] assumes to timely discharge the debt. The alternative was to equalize the property and assess [Wife] with a huge debt responsibility that the Court felt she could not and would not discharge.... The Court also felt that these parties needed a clean break from each other without lingering property ownership entanglements.... Thus, everything considered, the property division and debt allocation seems equitable.

It is apparent from the record that the trial court carefully considered its ruling regarding the marital property and made meticulous findings in support of its ruling. We see no abuse of discretion in the trial court's decision.

## II. Alimony

¶ 12 With respect to the trial court's alimony award, Wife first argues that the trial court erroneously failed to consider Husband's fault in reaching its decision. While the Utah Code permits trial courts to consider fault in awarding alimony, it provides only that the trial court "*may* consider the fault of the parties." Utah Code Ann. § 30-3-5(8)(b) (emphasis added); it does not require the trial court to do so. The court therefore did not err in failing to adjust the alimony award based on Husband's fault.

¶ 13 Wife further claims that the trial court erred in not considering Wife's

---

4. Wife argues that this court's decision in *Riley v. Riley*, 2006 UT App 214, 138 P.3d 84, mandates that trial courts make specific findings to justify a failure to divide retirement benefits equally. However, our decision in *Riley* stated that such findings are necessary only to justify "an unequal division of *marital property*," not retirement accounts specifically. *Id.* ¶ 27 (emphasis added). In *Riley*, the trial court acknowledged that its division of the retirement accounts was unequal but determined that an unequal division was justified under the specific circumstances of the case. *See id.* ¶¶ 29–30. The trial court did not make an unequal division in the present case but merely used the retirement accounts to compensate Husband for his acceptance of the vast majority of the marital debt; the net result did not actually leave Wife with an unequal share of the marital property.

health in making its alimony determination. The recipient spouse's health is not a factor courts have been directed to consider in fashioning an alimony award. *See id.* § 30–3–5(8). Thus, unless Wife's health somehow impacted one of the factors the trial court was required to consider, *see id.*, or gave rise to "extenuating circumstances" that would justify an award of permanent alimony, *see id.* § 30–3–5(8)(g)(ii), it was unnecessary for the trial court to make findings regarding Wife's health or to attach any consequence to it in fashioning the alimony award. Although Wife did contract a sexually transmitted disease, presumably from Husband, that resulted in her having a hysterectomy, she has failed to explain how her health concern entitles her to permanent alimony. While this might be relevant if Wife's ability to work had been hindered or if she had significant ongoing medical bills as a result of her health, *see Kelley v. Kelley,* 2003 UT App 317, ¶ 15, 79 P.3d 428 (Davis, J., dissenting) (suggesting circumstances where health concerns may justify an award of permanent alimony), the alimony provisions of the Utah Code do not provide a means for compensating the recipient spouse for the mere existence of a health problem where the health problem does not actually affect the recipient spouse's financial condition. Although such a health problem could conceivably fall into the category of fault where it was allegedly the result of Husband's actions, the trial court was not required to consider it from that standpoint, as discussed above, *see supra* ¶ 12.

¶ 14 Wife next argues that the trial court erred by ordering periodic decreases in the amount of alimony awarded. "[P]rospective changes to alimony are disfavored" unless they are based on "[a] future event [that] is certain to occur within a known time frame." *Richardson v. Richardson,* 2008 UT 57, ¶ 10, 201 P.3d 942. Moreover, "decreasing alimony-based on speculation about a future ability to earn-is generally inappropriate in view of the court's continuing jurisdiction to modify an original decree." *Rasband v. Rasband,* 752 P.2d 1331, 1334 n. 2 (Utah Ct.App.1988). *See generally* Utah Code Ann. § 30–3–5(8)(g)(i) ("The court has continuing jurisdiction to make substantive changes and new orders regarding alimony based on a substantial material change in circumstances not foreseeable at the time of the divorce."). However, in the case of rehabilitative alimony, a gradually decreasing award may be appropriate. *See Coleman v. Coleman,* 2002 UT App 148U, para. 1, 2002 WL 959886 (mem.) ("Decreasing rehabilitative alimony awards are by no means per se inequitable.").

¶ 15 Prospective changes to a traditional alimony award are distinguishable from structured decreases in rehabilitative alimony intended to ease the recipient spouse's financial adjustment period. A prospective change in alimony alters the award to which the recipient spouse would otherwise be entitled based on the trial court's anticipation of a future event that will materially change the parties' circumstances. When that anticipated event is certain, the trial court is in as good a position to make the adjustment at the time of the decree as it would be later. *See Richardson,* 2008 UT 57, ¶ 10, 201 P.3d 942 (holding that where a husband was paying both alimony and child support, prospective increases in alimony that coincided with scheduled future decreases in child support were permissible, as the future decreases represented a definite improvement of the husband's financial circumstances and a worsening of the wife's). However, if the anticipated event is only speculative, the trial court will be better able to make an educated adjustment when and if the event actually occurs. *See Rasband,* 752 P.2d at 1334 n. 2 (holding that where a wife was entitled to a long-term alimony award, it was inappropriate for the trial court to decrease the wife's alimony award prospectively based on its speculation that she might be able to increase her earning capacity in the future); *Nelson v. Nelson,* 2004 UT App 254, ¶¶ 5, 7, 97 P.3d 722 (per curiam) (holding that a husband could not prospectively seek to have his alimony obligation reduced based on his impending retirement but had to wait until after he retired to file a petition to modify).

¶ 16 A decreasing rehabilitative alimony award, on the other hand, defines

rather than alters the recipient spouse's future entitlement to alimony. "The purpose of rehabilitative alimony is in the short run to close the gap between actual expenses and actual income to enable the receiving spouse to then be better able to support [himor] herself when the [rehabilitative period] end[s]." *Mark v. Mark*, 2009 UT App 374, ¶ 12, 223 P.3d 476 (alterations in original) (internal quotation marks omitted). A gradually decreasing rehabilitative alimony award, as opposed to one that simply cuts off the alimony after a short time, eases the recipient spouse's road to self-sufficiency and is consistent with the goals of rehabilitative alimony.

¶ 17 The question, then, is whether the trial court intended the alimony award in this case to be rehabilitative or whether it improperly made prospective changes to a traditional alimony award. "[T]he length of the marriage, the age of the recipient spouse, and the employment history and employability of the recipient spouse" are relevant factors to consider in determining whether an award of rehabilitative alimony, rather than traditional alimony, is appropriate. *Id.* The trial court found that Wife was thirty-eight years old at the time of the divorce, that she had been employed part time at a rate of $11.50 per hour, and that she possessed significant professional skills. It also observed, in its ruling on Wife's objections to the proposed findings, that the parties did not have a long-term marriage. This is precisely the context in which a rehabilitative alimony award may be appropriate. *Compare, e.g., Jensen v. Jensen*, 2008 UT App 392, ¶ 19, 197 P.3d 117 (holding that a five-year alimony award was sufficient for a forty-one-year-old woman with marketable skills, education, and work experience to "put her house in order and be able to support herself" after a sixteen-year marriage (internal quotation marks omitted)), *and Rayburn v. Rayburn*, 738 P.2d 238, 239, 241 (Utah Ct.App.1987) (holding that a five-year rehabilitative alimony award was appropriate after a ten-year marriage for a woman who had previously been employed and was well-educated), *with Jones v. Jones*, 700 P.2d 1072, 1073, 1076 (Utah 1985) (holding that a decreasing rehabilitative alimony award was inappropriate after a thirty-year marriage for a woman in her midfifties who lacked marketable job skills), *and Rasband*, 752 P.2d at 1332–34 (holding that a decreasing rehabilitative alimony award was not appropriate after a thirty-year marriage for a fifty-two-year-old woman who had no education beyond high school, worked only occasionally during the marriage at minimum wage jobs, and had limited ability to work regularly outside the home because she had to care for a disabled daughter).[5] The trial court's explanation that "permanent alimony, in the Court's judgment, was not appropriate" and that "a gradual diminution of alimony is equitable and gives [Wife] incentive along the way to improve her job skills and become increasingly self-sufficient" strongly suggests that the trial court intended to order a rehabilitative alimony award rather than a traditional one.

¶ 18 One aspect of the trial court's ruling does give us pause, however, in classifying the award as rehabilitative alimony: It is unclear how long the trial court intended for the alimony to continue. The divorce decree contains an error in that the termination date is inconsistent with the number of years the decree states that the alimony is to continue. The divorce decree provides that alimony is to terminate at the end of 2015, after six-and-one-half years. This length of time would be consistent with an award of rehabilitative alimony. However, the findings also indicate that the first alimony amount of $1,428 per month is to continue for five years, that the second alimony amount of $1,000 per month

<hr/>

5. We also observe that this is not a case where Husband has surplus income sufficient to fill the gap between Wife's income and her unmet needs. *See* Utah Code Ann. § 30–3–5(8)(a)(iii) (Supp.2010) (listing payor spouse's ability to pay as a factor to consider in alimony). In order to pay Wife $1,428 per month in alimony, Husband must decrease his own monthly budget by $1,267. Although it is appropriate for the trial court to equalize the parties' standards of living in cases such as this, *see Batty v. Batty*, 2006 UT App 506, ¶ 5, 153 P.3d 827, it was not unreasonable for the trial court to limit that equalization to a period of adjustment sufficient for Wife to increase her earning capacity where her age and work experience suggest that she is reasonably capable of doing so.

is to continue for a further five years, and that the final alimony amount of $800 per month is to continue for some period after that before terminating. If the trial court did intend for the alimony to continue for over ten years, it is less likely that a rehabilitative alimony award was intended because, depending on how long the $800 was intended to continue, the duration of the award could approach the length of the marriage, the maximum duration that is generally permitted under Utah law, *see* Utah Code Ann. § 30-3-5(8)(h) (Supp. 2010) (prohibiting alimony awards lasting longer than the length of the marriage "unless ... the court finds extenuating circumstances that justify the payment of alimony for a longer period of time").

¶ 19 It is impossible to tell from the trial court's findings what length of time it actually intended for the alimony to continue. We must therefore remand for the trial court to clarify its finding. The trial court should also clarify, on remand, whether its award was intended to be rehabilitative or traditional. Given the circumstances of this case, neither ruling would be an abuse of the trial court's discretion.[6] However, if a traditional alimony award was intended, then the periodic decreases in alimony, which do not coincide with any certain future change in circumstances, should be eliminated.

¶ 20 Wife also argues that the divorce decree does not reflect the trial court's oral finding with respect to the initial amount of alimony. Although the trial court initially found that alimony should begin at $1,457 per month, it later acknowledged a misstatement in its oral findings and a mathematical error in its calculations. Because the parties' combined needs exceeded their combined income, the trial court's calculation of the initial alimony amount was intended to leave the parties with equal monthly shortfalls. In its oral findings, the trial court stated that Husband's income left him with a $217 *shortfall* in meeting his monthly expenses before alimony. However, the trial court's $1,457 alimony calculation was actually based on Husband having a $217 *surplus*. The trial court subsequently acknowledged this and also discovered that it had made a mathematical error in calculating the $217 surplus, as Husband's $6,600 per month income, his $5,792 monthly expenses, and his $667 child support obligation actually left him with a $161 per month surplus. The trial court adjusted its calculations accordingly and ordered Husband "to pay a corrected sum of alimony in the amount of $1,428 per month" for the first alimony period. Thus, the divorce decree's provision of $1,428 per month for the first alimony period was not an error.

## CONCLUSION

¶ 21 The trial court did not abuse its discretion either in dividing the marital property or in setting the amount and duration of alimony. Nevertheless, we remand for the trial court to clarify its intent as to the duration of the alimony award and to make additional adjustments to the award as necessary in a manner consistent with this opinion.

¶ 22 WE CONCUR: J. FREDERIC VOROS JR. and MICHELE M. CHRISTIANSEN, Judges.

---

6. "Trial courts have broad discretion in making alimony awards so long as they consider [the statutory alimony factors]" and are "mindful of the primary purposes of alimony" to maintain the standard of living the parties enjoyed during the marriage, to equalize the parties' standards of living, and to prevent either party from becoming a public charge. *Jensen v. Jensen*, 2008 UT App 392, ¶ 9, 197 P.3d 117. Employing this standard, there will generally be a range of possible outcomes that the trial court could appropriately reach in exercising its broad discretion. So long as the trial court has not "clearly and prejudicially abused its discretion," the fact that its decision may be "vulnerable to criticism" will not move us to "substitut[e] our judgment for that of the trial court." *Id.* ¶ 20.