2019 UT App 114

## THE UTAH COURT OF APPEALS

TODD EBERHARD,
Appellant,
*v.*
LORI ANN EBERHARD,
Appellee.

Opinion
No. 20170721-CA
Filed June 27, 2019

Third District Court, Salt Lake Department
The Honorable Paige Petersen
No. 024906303

David Pedrazas, Attorney for Appellant

Suzanne Marelius, Attorney for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

POHLMAN, Judge:

¶1     Todd Eberhard and Lori Ann Eberhard divorced in 2003 after twenty-nine years of marriage. The stipulated divorce decree provided that Todd[1] would pay $4,200 in monthly alimony to Lori and that upon Todd's retirement at age 65, "spousal support shall be reviewed and modified as provided by law." After the divorce, Todd continued to work as a physician, while Lori, who had no prior work experience, obtained a job in customer service four years later, in 2007.

---

1. Because the parties share a surname, we refer to each party by his or her first name, as is our practice in such situations. We intend no disrespect by the apparent informality.

¶2      In anticipation of his planned retirement in 2016, Todd filed a petition to modify the decree, seeking to terminate or reduce alimony once he and Lori began receiving funds from his pension. After a bench trial, the district court denied Todd's request to modify alimony at that time, ordering Todd to continue paying $4,200 in alimony. But the court ordered that when Lori "reaches her full retirement age of 66 and is eligible to receive a social security retirement payment," Todd's alimony payment would be reduced by that amount. The court further ordered Todd to pay half of Lori's attorney fees and costs incurred defending against his petition to modify. Todd appeals, challenging the court's alimony and attorney fees decisions. We affirm in part and remand for the entry of additional findings of fact, without restriction to any modifications the court deems appropriate.

## STANDARDS OF REVIEW

¶3      District courts have "considerable discretion in determining alimony." *Boyer v. Boyer*, 2011 UT App 141, ¶ 9, 259 P.3d 1063 (cleaned up). This court reviews "a district court's alimony determination for an abuse of discretion and will not disturb its ruling on alimony as long as the court exercises its discretion within the bounds and under the standards [Utah appellate courts] have set and has supported its decision with adequate findings and conclusions." *Dahl v. Dahl*, 2015 UT 79, ¶ 84 (cleaned up). Similarly, we "generally review a district court's determination to modify or not to modify a divorce decree for an abuse of discretion."[2] *Fish v. Fish*, 2016 UT App 125, ¶ 5, 379 P.3d 882.

---

2. Todd also contends that the district court erred in denying his motion for a new trial and his motion to amend the findings and

(continued…)

¶4 When considering a challenge to the sufficiency of the evidence, "we will not set aside findings of fact, whether based on oral or documentary evidence, unless they are clearly erroneous." *Dahl*, 2015 UT 79, ¶ 121; *see also Shuman v. Shuman*, 2017 UT App 192, ¶ 3, 406 P.3d 258. A district court's "factual determinations are clearly erroneous only if they are in conflict with the clear weight of the evidence, or if [we have] a definite and firm conviction that a mistake has been made." *Taft v. Taft*, 2016 UT App 135, ¶ 16, 379 P.3d 890 (cleaned up).

¶5 The district court must "make adequate findings on all material issues of alimony to reveal the reasoning followed in making the award." *Id.* ¶ 14 (cleaned up). "Findings are adequate only if they are sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Id.* (cleaned up). Whether the district court's findings are adequate presents a question of law. *Dole v. Dole*, 2018 UT App 195, ¶ 3, 437 P.3d 464; *Jacobsen v. Jacobsen*, 2011 UT App 161, ¶ 15, 257 P.3d 478.

¶6 We review the district court's award of attorney fees under Utah Code section 30-3-3, including the amount of the award, for abuse of discretion. *Dahl*, 2015 UT 79, ¶ 168; *Davis v. Davis*, 2003 UT App 282, ¶ 14, 76 P.3d 716.

_____

(…continued)

judgment, both of which raised issues with the district court's alimony decision. As with the court's alimony decision, we review its denial of both post-trial motions for abuse of discretion. *See Eskelsen v. Theta Inv. Co.*, 2019 UT App 1, ¶ 22, 437 P.3d 1274 (motions to amend findings and judgment); *Hartvigsen v. Hartvigsen*, 2018 UT App 238, ¶ 5, 437 P.3d 1257 (motions for a new trial).

ANALYSIS

## I. Alimony

¶7   Relevant to this appeal, the Utah Code instructs district courts to consider certain factors—known as the *Jones* factors—when determining alimony, including "the recipient's earning capacity or ability to produce income," "the financial condition and needs of the recipient spouse," and "the ability of the payor spouse to provide support."[3] Utah Code Ann. § 30-3-5(8)(a)(i)–(iii) (LexisNexis 2013); *see also Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985) (listing these factors later codified in Utah Code section 30-3-5). The court's findings on each statutory factor must be sufficiently detailed "to enable a reviewing court to ensure that the [district] court's discretionary determination was rationally based upon these factors." *Keyes v. Keyes*, 2015 UT App 114, ¶ 33, 351 P.3d 90 (cleaned up).

¶8   The Utah Code also instructs that district courts should generally "look to the standard of living, existing at the time of separation, in determining alimony." Utah Code Ann. § 30-3-5(8)(e). "However, the court shall consider all relevant facts and equitable principles and may, in its discretion, base alimony on the standard of living that existed

---

3. The other factors that the court must consider include the following: "(iv) the length of the marriage; (v) whether the recipient spouse has custody of minor children requiring support; (vi) whether the recipient spouse worked in a business owned or operated by the payor spouse; and (vii) whether the recipient spouse directly contributed to any increase in the payor spouse's skill by paying for education received by the payor spouse or enabling the payor spouse to attend school during the marriage." Utah Code Ann. § 30-3-5(8)(a)(iv)–(vii) (LexisNexis 2013).

at the time of trial."[4] *Id.*; *see also Dahl v. Dahl*, 2015 UT 79, ¶ 111 ("[W]hile an alimony award would ideally allow both spouses to maintain the standard of living enjoyed during the marriage, the court is nevertheless obligated to support any alimony award with specific factual findings as to each statutory factor and is permitted to deviate from the general rule in light of the relevant facts and equities."). "Furthermore, the award should advance, as much as possible, the purposes of alimony by assisting the parties in achieving the same standard of living they enjoyed during the marriage, equalizing the parties' respective standards of living, and preventing either spouse from becoming a public charge." *Hansen v. Hansen*, 2014 UT App 96, ¶ 6, 325 P.3d 864 (cleaned up). These same considerations apply in later modification proceedings. *Nicholson v. Nicholson*, 2017 UT App 155, ¶ 17, 405 P.3d 749.

¶9      Here, the district court relied on the parties' testimony at the trial on the petition to modify to determine their standard of living at the time of their separation. Specifically, the court found that "during the marriage these parties enjoyed a good lifestyle with a nice home for their five-person family, a paid-for car, regular vacations, and they paid their bills in full every month."

¶10     The court then considered the *Jones* factors. It found that every month Lori, who was age 63 at the time of trial, earned $1,621.88 from her customer service job, received $4,200

---

4. This court has understood this statute "to allow a court the discretion to consider the standard of living at the time the modification petition is tried" and noted that "[s]uch a reading comports with the rationale underlying alimony modification proceedings: adjustment to reflect changed financial circumstances." *Nicholson v. Nicholson*, 2017 UT App 155, ¶ 20, 405 P.3d 749.

in alimony, and received $1,533.74 as her share of Todd's pension. After deducting taxes, Lori was left with a net monthly income of $6,141. Lori also had $330,000 in retirement accounts, which was her share of the divorce settlement. Lori had incurred loans and debt after the divorce, and her reasonable monthly expenses amounted to $5,309—an amount that the court found was "less than what [Lori] requires to live commensurate with the marital standard of living."

¶11   As for Todd, who was 66 years old and remarried, the court found that every month he received $3,827.71 from his pension and $2,326 from Social Security, and drew $3,500 from various retirement accounts. After deducting taxes, Todd had a net monthly income of $7,654. In addition, the court found that Todd had $1.5 million in retirement accounts from which he could draw "variable" amounts "at his discretion." Todd testified that he was supporting his current spouse who was not employed. The court found Todd's reasonable monthly expenses to be $8,041—a figure that did not include the alimony payment. The court also found that he had "a very secure and comfortable lifestyle" and "no debt." As a result, the court found that Todd "has the ability to pay $4,200 [in] monthly alimony."

¶12   In arriving at its decision, the district court deemed two other statutory factors "significant." In particular, the court considered "whether the recipient spouse directly contributed to any increase in the payor spouse's skill by paying for education received by the payor spouse or enabling the payor spouse to attend school during the marriage," Utah Code Ann. § 30-3-5(8)(a)(vii), and whether "one spouse's earning capacity has been greatly enhanced through the efforts of both spouses during the marriage," *id.* § 30-3-5(8)(g). The court determined that both of these factors were "applicable and support no reduction of alimony in this case."

¶13    Based on these findings, the court denied Todd's request to terminate or reduce alimony at that time.[5] It determined that Todd will continue to pay $4,200 in monthly alimony for three years—until Lori reaches age 66 and qualifies for Social Security. At that point, Lori will receive about $1,319 per month from Social Security, and the court ordered that Todd will then be allowed to reduce the alimony payment by the amount Lori receives from Social Security. In so doing, the court stated that Lori's income from her job, alimony, and Todd's pension are presently "needed to meet her reasonable expenses," but even then "she will still not have the standard of living of the marriage." It noted that Lori's needs "include the shortfall she has accumulated over the years since the divorce" and that Lori was "presently only barely meeting her needs for that debt service and reasonable monthly expenses." Given these considerations, the court stated its "intent to move [Lori] closer to being able to pay off her debt and better achieve a standard of living commensurate with the marital standard of living in this alimony award." However, the court made no specific finding as to what Lori's reasonable total monthly needs would be, observing only that her needs were greater than her current monthly expenses of $5,309.

¶14    We address Todd's challenges to the alimony award as follows: (A) the marital standard of living, (B) Lori's earning capacity, (C) Lori's needs, (D) Todd's ability to provide support, and (E) the parties' line-item expenses. We affirm the district court in most respects, but we remand for the court to provide

---

5. Given the language in the decree stating that "spousal support shall be reviewed and modified" upon Todd's retirement, the parties appear to assume that Todd's retirement opened the door for the district court to modify alimony. We have no occasion to question that assumption in this case.

additional findings on the issues of Lori's needs and Todd's ability to pay.

A.     The Marital Standard of Living

¶15    Todd contends that the district court's findings about the parties' standard of living at the time of divorce—particularly regarding whether the cars were paid off and whether the parties paid their bills in full—were not supported by sufficient evidence. Todd also contends, in a conclusory manner, that the district court's findings were inadequate.

¶16    As stated, the court found that "[t]he trial testimony confirmed that during the marriage these parties enjoyed a good lifestyle with a nice home for their five-person family, a paid-for car, regular vacations, and they paid their bills in full each month." The court noted that the parties' testimonies in this regard were "quite consistent" and were sufficient to support its findings regarding the standard of living at the time of the divorce.

¶17    Todd has not shown clear error in the district court's findings on this score. First, Todd overlooks the fact that Lori testified that during the marriage she always had a car and they "paid for [their] cars outright[]." Second, Todd ignores Lori's testimony that, except for the house, they had no debt, "paid off [their] credit cards," and had funds available for unexpected expenses like replacing tires on a car. We conclude that Lori's testimony in this regard is sufficient evidence to support the district court's findings. *See Bond v. Bond*, 2018 UT App 38, ¶ 10, 420 P.3d 53 (reasoning that "[b]ecause the trial court's factual findings are clearly supported by [a witness's] testimony, we cannot conclude that they lack general evidentiary support"); *see also Barrani v. Barrani*, 2014 UT App 204, ¶ 24, 334 P.3d 994 ("[A]n appellate court's role is not to reweigh the evidence presented at trial but only to determine whether the court's

decision is supported by the evidence, leaving questions of credibility and weight to the trial court.").

¶18    Todd's general challenge to the adequacy of the district court's findings also fails. The court explicitly stated that in considering the parties' standard of living existing at the time of divorce, it was relying on the parties' trial testimony, and Todd has not established that the court failed to show "the steps by which the ultimate conclusion on each factual issue was reached." *See Taft v. Taft*, 2016 UT App 135, ¶ 14, 379 P.3d 890 (cleaned up). We therefore reject Todd's arguments about the sufficiency of the evidence and adequacy of the district court's findings regarding the parties' standard of living.

B.    Lori's Earning Capacity

¶19    Todd contends that in considering Lori's earning capacity and ability to produce income, the district court "should have included [Lori's] income from Social Security and the unearned income from her retirement [accounts]."

¶20    District courts generally have "broad discretion in selecting an appropriate method of assessing a spouse's income." *Griffith v. Griffith*, 1999 UT 78, ¶ 19, 985 P.2d 255; *see also, e.g.*, *Davis v. Davis*, 2003 UT App 282, ¶ 10 n.3, 76 P.3d 716 (concluding that "while the trial court could have considered [a portion of the wife's monthly paycheck that she saved for retirement] as income, the court did not exceed its permitted range of discretion in choosing not to do so" (cleaned up)). Indeed, Utah law specifically grants district courts "flexibility to consider all sources of income" without mandating that the court treat all sources as income for purposes of calculating alimony. *See Busche v. Busche*, 2012 UT App 16, ¶ 31, 272 P.3d 748; *see also Crompton v. Crompton*, 888 P.2d 686, 689 (Utah Ct. App. 1994) (explaining that "it would be inappropriate for an appellate court to tie the hands of a [district] court" by requiring it in

every case to confine its consideration of income in a certain way). Such matters are "left to the [district] court's judgment," *Busche*, 2012 UT App 16, ¶ 31, and will not be set aside absent "a clear and prejudicial abuse of discretion," *Griffith v. Griffith*, 959 P.2d 1015, 1019 (Utah Ct. App. 1998), *aff'd*, 1999 UT 78, 985 P.2d 255.

¶21 In support of his position, Todd relies on Utah caselaw stating that "when determining an alimony award, it is appropriate and necessary for [district] courts to consider all sources of income." *Hansen v. Hansen*, 2014 UT App 96, ¶ 14, 325 P.3d 864 (cleaned up). It is correct that district courts "must be able to consider all sources of income that were used by the parties during their marriage to meet their self-defined needs, from whatever source—overtime, second job, self-employment, etc., as well as unearned income." *Crompton*, 888 P.2d at 689. But while this caselaw directs district courts to *consider* all sources of income when determining alimony, it does not dictate that all sources of income be *counted* as income received by a spouse for that purpose. Rather, we read this caselaw as preserving a district court's broad discretion to treat sources of income as the court sees fit under the circumstances. *See Griffith*, 1999 UT 78, ¶ 19; *Busche*, 2012 UT App 16, ¶ 31.

¶22 In calculating Lori's earning capacity and ability to produce income, the district court considered and declined to include as income any funds that Lori could potentially draw from her retirement accounts or that she could receive by electing to collect Social Security benefits early. The court found that if Lori began receiving Social Security benefits at her then-current age of 63, she would receive less than she would if she waited until age 66. As the court stated, "[t]he parties did not dispute that at [Lori's] current age she would receive 37.8% of the 50% retirement benefit she could claim on [Todd's] earnings record" and it was "undisputed that if she waited until age 66, her full retirement age, she could claim the full 50% on that

earning record."[6] Lori would "suffer a financial penalty" if she began drawing on Social Security benefits before age 66. As a result, the court was unwilling "to require [Lori] to make an unwise financial decision" and declined to include these sources in its calculation of Lori's income.

¶23   Todd has not shown an abuse of discretion under these circumstances. Lori was not receiving Social Security benefits and would have faced reduced benefits if she began receiving them early. Given the fact that the court was concerned that Lori's "needs have not been met by the alimony order made at the divorce," the court considered Lori's potential Social Security benefits and reasonably decided not to impose an "unwise financial decision" on Lori by requiring her to start receiving a smaller amount of Social Security benefits than she otherwise would be entitled to take three years later.[7]

¶24   Todd also has not shown that the district court abused its discretion by choosing not to include in Lori's income any unearned income generated from her retirement accounts. Though Todd urged the court to assume "a modest 6% interest" rate on Lori's retirement accounts, he did not provide evidence

_____

6. Under Social Security Administration rules, a person may retire at any time between age 62 and full retirement age, but if a person begins collecting benefits early, those benefits are reduced. *See* Benefits Planner: Retirement, Social Security Administration, https://www.ssa.gov/planners/retire/agereducti on.html [https://perma.cc/B5RT-SUQY]. *See generally* 20 C.F.R. § 404.409 (2018); *id.* § 404.410.

7. The court further observed that Lori was trying to work as long as she could and that when she retires and takes Social Security, those benefits will "cancel" or "replace" her salary from her customer service job.

in support of his request, and Lori did not agree with that figure. At trial, Lori testified that two-thirds of her retirement account was tied up in annuities from which she would not receive income until she reaches age 70. She testified that she had not yet drawn on the other one-third of her retirement, and when asked whether she was earning interest, she responded that her account "fluctuates up and down" and could not say whether she had realized an increase. In light of the record and the district court's "broad discretion in selecting an appropriate method of assessing a spouse's income," *Griffith*, 1999 UT 78, ¶ 19, the court did not exceed the bounds of its discretion in declining to treat any unearned income on Lori's retirement accounts as income for purposes of determining alimony.

¶25    Moreover, Todd has cited no authority for the proposition that a court must require a spouse to claim early Social Security benefits or begin withdrawals from retirement accounts. We have located no such Utah authority. But we note that authority from other jurisdictions counters Todd's position. *See, e.g., Huertas Del Pino v. Huertas Del Pino*, 229 So. 3d 838, 839–42 (Fla. Dist. Ct. App. 2017) (holding that, for purposes of awarding alimony, income should not be imputed to an ex-spouse "based on her eligibility for Social Security retirement benefits she had not yet applied to receive" when "there was no evidence of any bad faith" on the ex-spouse's part and when "she articulated a rational reason for delaying her application for Social Security benefits—namely, that she would receive greater benefits by postponing her receipt of benefits"); *McKernan v. McKernan*, 135 A.3d 1116, 1117–18 (Pa. Super. Ct. 2016) (locating "no authority empowering a trial court to order [the wife] to apply for and obtain Social Security Retirement benefits prior to reaching full retirement age," or requiring the inclusion as part of the wife's income the benefit amount for which she is eligible); *see also, e.g., Gutierrez v. Gutierrez*, 972 P.2d 676, 681 (Ariz. Ct. App. 1998) (stating that a receiving spouse "should not be compelled to withdraw the money in [a] retirement account to supplement her

modest income" and that the "spouse should not be expected to live off both the principal, and interest, exhausting whatever financial reserves she possesses to the extent that when she no longer had any earning capacity there would be nothing left upon which she could draw" (cleaned up)); *In re Marriage of Novak*, 83 S.W.3d 597, 601 (Mo. Ct. App. 2002) (explaining that income from retirement accounts "must be considered in calculating benefits" but that "trial courts are not required to impute income [from] retirement and IRA accounts in every case" given their broad discretion in this area).

¶26   For these reasons, we conclude that the district court acted within its discretion when it declined to include Social Security and unearned income on Lori's retirement accounts as part of her current income. Given our conclusion in this regard, we likewise conclude that the district court did not abuse its discretion in denying Todd's motion for a new trial based on these same issues.

C.     Lori's Needs

¶27   Next, Todd contends that the district court erred in finding that Lori's needs were unmet when evaluating her financial condition and needs. Todd's argument has three parts. First, he relies on Utah Code section 30-3-5(8)(i)(ii) to argue that the district court erroneously considered Lori's needs that did not exist at the time of the divorce. Second, he argues that the evidence was insufficient to support the court's finding that Lori's needs were not being met *at the time the decree was entered*. Third, he contends that the court's findings regarding Lori's needs are not adequate.

1.     Utah Code Section 30-3-5(8)(i)(ii)

¶28   Todd first claims that the district court "improperly addressed [Lori's] needs . . . that did not exist at the time the

decree was entered." Todd bases this argument on Lori's purchase of a furnace and air conditioner, her periodic visits to a chiropractor, her car loan for a new vehicle, and her "debt incurred after voluntarily being unemployed for 4 years after the divorce." Citing Utah Code section 30-3-5(8)(i)(ii), Todd then concludes that Lori "failed to cite any extenuating circumstances that would allow the court to address [her] needs . . . that didn't exist at the time of divorce."

¶29    Utah Code section 30-3-5(8)(i)(ii) provides that "[t]he court may not modify alimony or issue a new order for alimony to address needs of the recipient that did not exist at the time the decree was entered, unless the court finds extenuating circumstances that justify that action." Utah Code Ann. § 30-3-5(8)(i)(ii) (LexisNexis 2013). In other words, absent extenuating circumstances, the statute "generally prevents a district court from modifying an alimony award to account for new needs."[8] *Fish v. Fish*, 2016 UT App 125, ¶ 6, 379 P.3d 882.

¶30    In a pretrial motion in limine, Todd asserted that, under section 30-3-5(8)(i)(ii), the court was "prohibited from addressing [Lori's] increased needs . . . without finding extenuating circumstances." According to the motion, the district court "should only review whether [Todd] has the ability to pay the current amount of ordered alimony and whether [Lori's] need for $4,200 per month has been reduced based upon the pension benefits received from [Todd's] retirement and [Lori's] Social Security." Before the presentation of evidence at trial, the court ruled that it would not exclude any evidence and that it would

---

8. This court has previously noted that this statute "does not appear to forbid a court from considering the recipient spouse's new needs in its decision not to modify." *Fish v. Fish*, 2016 UT App 125, ¶ 8 n.3, 379 P.3d 882.

figure out later "how the law should apply to whatever facts" were adduced at trial.

¶31 On appeal, Todd asserts that the district court did not find extenuating circumstances under section 30-3-5(8)(i)(ii) and that the court erroneously addressed Lori's needs that did not exist at the time of divorce. We reject this argument because it rests on a false premise, namely, that the district court accounted for Lori's needs that did not exist at the time of the divorce. In fact, the district court explained, in a post-trial order, with regard to section 30-3-5(8)(i)(ii) that "[n]ot knowing before trial what evidence of increased needs might be submitted, the Court agreed that any increased needs not existing at the time of the divorce would not be used to increase the alimony award unless it was justified by extenuating circumstances." The court further explained that "[n]one of [Lori's] current expenses were new, increased needs that did not exist at the time of the divorce," given that "[t]hey were basic needs that existed at the time of the divorce," including the needs for "a home, heating and air conditioning in the home, a car, food, and basic medical care."[9]

¶32 The court's decision was "not based on any new needs, but based on exactly the same kind of needs that [Lori] had in 2003." Because Lori had been "forced to take out a second mortgage" and incur credit card debt to meet basic needs, the court found that Lori's standard of living had "fallen" from the lifestyle she enjoyed at the time of the divorce and that Lori's needs "have not been adequately provided for at the marital

_____

9. Because the parties stipulated to the divorce decree, the district court entered the decree in 2003 without making findings regarding Lori's needs at the time of the divorce. As a result, in ruling on Todd's petition to modify, the court effectively found that Lori's current needs existed at the time of the divorce, and it analyzed whether Lori could meet her needs.

standard since the time of the divorce." Thus, instead of addressing needs that did not exist at the time of the divorce, the court found on Todd's petition to modify that the stipulated alimony had never met Lori's needs because it still did not "bring[] her up to [the marital] standard of living."[10] Ultimately, new or "increased needs did not factor into" or underlie the court's decision. Because we disagree with Todd's characterization of the district court's decision, Todd has not shown that it ran afoul of section 30-3-5(8)(i)(ii).

¶33 Relatedly, Todd contends that the district court erred in denying his motion for a new trial, which raised three grounds related to section 30-3-5(8)(i)(ii). He argued that a new trial was justified due to "an irregularity in the proceeding," insufficient evidence, and an error in law.[11] Todd's motion was largely based on his understanding that evidence of Lori's increased needs

---

10. Before the district court, Todd argued that the $4,200 of alimony awarded in the decree defined or equated to Lori's needs at the time of the divorce and that Lori's receipt of $1,533.74 from his pension meant that she had an increase in needs since that time. The court rejected these arguments, explaining that the stipulated amount of alimony "ended up not being enough to keep her in the lifestyle that she was accustomed to" and that, even with the pension, Lori had "exactly the same kind of needs that she had in 2003."

11. Under rule 59 of the Utah Rules of Civil Procedure, a new trial may be granted due to "irregularity in the proceedings of the court, jury or opposing party, or any order of the court, or abuse of discretion by which a party was prevented from having a fair trial"; due to "insufficiency of the evidence to justify the verdict or other decision"; or when "the verdict or decision is contrary to law or based on an error in law." Utah R. Civ. P. 59(a)(1), (6), (7).

would be considered only upon a finding of extenuating circumstances. According to Todd, he "shifted [his] strategy" in response to the district court's ruling on his motion in limine, and he "focuse[d] on disproving extenuating circumstances" instead of submitting evidence of his ability to pay alimony and contesting more of Lori's expenses. In attacking the court's denial of his motion for a new trial, Todd again rests his arguments on the premise that the court addressed increased needs.

¶34   But Todd again misreads the district court's decision. The court did not agree to exclude any evidence when it ruled on Todd's motion in limine, and it ultimately did not address Lori's needs that did not exist at the time of divorce. Under these circumstances, Todd has not shown that the court abused its discretion in denying him a new trial under any of his proposed justifications or theories.

2.    Sufficiency of the Evidence

¶35   Second, Todd argues that the evidence was insufficient to support the court's finding that Lori's needs were not being met at the time of the decree. The court found that although Lori's needs at the time of divorce were not expressly determined in 2003, the decree's alimony award of $4,200 "ended up not being enough to keep [Lori]" living at the marital standard. The court stated that it drew this finding from the evidence that Lori had a second mortgage on her house; she "kept the same car for 12 years, she bought a used car, [and] she's got a loan on [it]"; she had credit card debt;[12] and she has a "more modest

---

12. Todd makes much of the fact that Lori's credit card debt increased substantially between 2014 and 2016, suggesting that her debt did not increase between 2003 and 2014 and that her needs were met in 2003. But Todd overlooks that Lori incurred

<span style="text-align:right">(continued…)</span>

standard of living" compared to that of the marriage. Given that the marital standard of living included paid-for cars and bills paid in full each month, and that Lori had been "borrowing to fill the gap in her needs created by the divorce," the district court did not clearly err in finding that Lori's needs at the time of the divorce had not been met by the $4,200 alimony award.

### 3.      Adequacy of the Findings

¶36     Third, Todd claims that the district court's findings regarding Lori's needs are inadequate to show that her needs were not being met. In considering this issue, we bear in mind that this court has stated that a district court "may not merely restate the recipient spouse's testimony regarding her monthly expenses"; instead, "the court must state that the calculation of monthly expenses is reasonable and must explain how it arrived at the monthly amount, or at least from the record, allow us to make this determination ourselves." *Rehn v. Rehn*, 1999 UT App 41, ¶ 7, 974 P.2d 306 (cleaned up). Further, we are mindful that "regardless of the payor spouse's ability to pay more, the recipient spouse's demonstrated need must constitute the maximum permissible alimony award." *Jensen v. Jensen*, 2008 UT App 392, ¶ 13, 197 P.3d 117 (cleaned up). Indeed, "[a]n alimony award in excess of the recipient's need is a basis for remand even when the payor spouse has the ability to pay." *Barrani v. Barrani*, 2014 UT App 204, ¶ 30, 334 P.3d 994.

¶37     Todd focuses his attack on Paragraph 18 of the court's findings, which states:

---

(…continued)
other debts—the second mortgage and the car loan—between 2003 and 2014.

> The Court finds that in many ways [Lori's] needs have not been met by the alimony order made at the divorce, and that her standard of living has fallen below the quality of life and standard of living of the marriage to which she is entitled. Her Financial Declaration shows significant debt consisting of a first and second mortgage on her residence, a vehicle loan with a balance of $17,229, credit card debt of $16,296, and her attorney fees have been put on a credit card. Her Financial Declaration showed a gap between her net income of $4,608, before receipt of pension, and expenses of $5,309 showing a monthly shortfall. Her listing of current expenses shows $220 per month as the minimum payment on her credit cards which will not realistically pay the debt. The Court finds [Lori] has been borrowing to fill the gap in her needs created by the divorce. It appears that she has a shrunken standard of living compared to the marital standard of living as she has incurred loans and debt, which was not part of the marital standard. [Lori] has not been extravagant. Her stated needs on the Declaration of $5,309 are very reasonable and, in fact, less than what she requires to live commensurate with the marital standard of living and the Court finds a historic gap and income shortfall since the divorce which has created debt. It is evident that [Lori's] debt will not be paid off at the minimal contribution level, that any future emergency such as a flat tire, medical expense, replacement of a furnace or attorney fees requires her to add to her debt as she does not have resources to pay for such events.

Under the district court's math, Lori had a monthly shortfall of $701 before she started receiving her portion of Todd's pension.

And after she started receiving money from the pension, she had a surplus of $832—a result that appears in conflict with the principle that alimony may not exceed the recipient spouse's needs. *See id.*; *Jensen*, 2008 UT App 392, ¶ 13.

¶38 Nevertheless, we do not understand the court to have intended to award Lori more than her needs. Although there appears to be a surplus, awarding her more than her stated monthly expenses appears to be consistent with the court's overall intention to award sufficient alimony to help Lori retire debts and achieve the marital standard of living. Indeed, the court expressed its intention "to move [Lori] closer to being able to pay off her debt and better achieve a standard of living commensurate with the marital standard of living in this alimony award."

¶39 Yet the district court's findings regarding Lori's needs are not sufficiently detailed to "disclose the steps" the court took to reach its ultimate conclusion that the $4,200 in alimony was required to meet those needs. *See Rayner v. Rayner*, 2013 UT App 269, ¶ 11, 316 P.3d 455 (cleaned up). The court relied on Lori's financial declaration to find that her existing reasonable monthly expenses were $5,309, but the court found that this amount was "less than what she requires to live commensurate with the marital standard of living." The court also found that Lori's $220 monthly payment on her credit cards "will not realistically pay the debt" and that Lori was "only barely meeting her needs for [her] debt service." But the court's findings do not specify how much more Lori actually needs each month to pay down her debt and elevate herself to the marital standard of living, which includes living without debt.

¶40 It may be that the court concluded that the $832 surplus was enough for Lori to reach those goals. It also may be that the court concluded that the additional $832 still did not achieve those goals. Without the district court more precisely spelling

out the amount that Lori realistically requires to pay off the debt and to enjoy the marital standard of living, we are unable to discern whether the alimony award, in fact, exceeds her needs. We thus cannot conduct meaningful appellate review and cannot ensure that the district court's discretionary determination on alimony was "rationally based." *See Fish v. Fish*, 2016 UT App 125, ¶ 22, 379 P.3d 882. Accordingly, we remand for the district court to enter more detailed findings on this issue and to alter its conclusions as may be necessary. *See Barrani*, 2014 UT App 204, ¶ 30; *Rayner*, 2013 UT App 269, ¶ 12.

D.     Todd's Ability to Provide Support

¶41     Todd complains that the district court "failed to properly consider [his] needs and expenses." He asserts that the court's decision left him with a $4,587 total shortfall, while Lori's "alimony award exceeds her needs." He also asserts that the court's findings regarding his ability to provide support were inadequate.

¶42     Paragraphs 22 and 23 of the district court's findings of fact address Todd's ability to pay alimony. In particular, the court found that after adjustments, Todd's expenses were $8,041 per month. It also found that

> [Todd's] stated net [income] is $7,654 which creates a shortfall; however, he has discretion over a large part of his income. [Todd] has accumulated retirement assets consisting of bond funds, IRAs, [a] 401(k), and annuities, which total $1.5 million in principal. [Todd] testified that he takes a monthly draw of 3% ($3,500) per month, and that the amount of the draw is entirely at his discretion. The Court notes that if his draw increased 1%–2% he is still not likely to run out of his principal over the remaining alimony term or his lifetime.

¶43    An alimony award "must be within the payor spouse's ability to pay." *McPherson v. McPherson*, 2011 UT App 382, ¶ 15, 265 P.3d 839. Here, in finding that Todd could pay alimony, the court acknowledged that Todd had a shortfall. In so doing, it did not account for the $4,200 alimony payment that he was making to Lori, and it suggested that Todd had enough money in his retirement accounts to cover his shortfall. But the court did not explain in enough detail how, given the shortfall, the alimony award was within Todd's ability to pay. The court also did not provide specific calculations to show that Todd could draw sufficient funds from his retirement accounts to cover the shortfall while not unreasonably depleting the principal.

¶44    As with its findings about Lori's needs, we conclude that the court's findings about Todd's ability to pay do not "disclose the steps" it took to reach its ultimate conclusion that the alimony award was within Todd's ability to pay. *See Rayner v. Rayner*, 2013 UT App 269, ¶ 11, 316 P.3d 455 (cleaned up). We therefore remand for the district court to enter more detailed findings on this issue as well. To the extent the court on remand modifies Lori's needs and Todd's ability to pay, the court should also reconsider its alimony determination in light of any altered figures. *See Dobson v. Dobson*, 2012 UT App 373, ¶ 29, 294 P.3d 591; *see also Barrani v. Barrani*, 2014 UT App 204, ¶ 30, 334 P.3d 994 (explaining that "where the recipient's needs appear to exceed the payor's ability to pay and the alimony award seems to exceed the recipient's needs, we must remand to give the trial court an opportunity to address the apparent discrepancies in the alimony calculation and to conduct an appropriate reanalysis . . . . [to] ensure that the alimony award exceeds neither [the recipient's] demonstrated need nor [the payor's] ability to pay").

E.    The Parties' Line-Item Monthly Expenses

¶45    Lastly, Todd challenges the district court's decisions regarding several of the parties' line-item expenses: (1) Lori's

food and household expenses; (2) Lori's extracurricular activities, which included airfares to visit the parties' adult children; (3) Lori's expenses on donations and gifts; (4) Todd's dental expenses; and (5) the parties' real property maintenance expenses.

¶46    First, Todd contends that the district court erred when it allowed Lori to have $500 in food and household expenses, when she had claimed only $300 for such expenses in 2014 and when "there was no justification for the increase of $200 per month." The district court found that Lori's "stated needs" on her 2016 financial declaration were "very reasonable." The court thus accepted Lori's figure of $500 for her monthly food and household supplies and thereby found that $500 accurately represented such expenses. Regardless of whether Lori stated a lower figure for such needs in 2014, Todd has not shown that the district court's finding of her needs on this point lacked sufficient evidentiary support or required more detailed findings. *See Fish v. Fish*, 2016 UT App 125, ¶ 28, 379 P.3d 882 ("Failure to rule in favor of one party neither renders the evidence insufficient to support the findings nor the findings inadequate to support the ruling.").

¶47    Second, Todd challenges the court's decision to allow Lori $200 per month for extracurricular activities, which included air flights to visit their adult children. When Todd examined Lori about these expenses at trial, Lori testified that those expenses were for her travel to visit the parties' children and "often include[d] the food at the destination" for herself and the children when she was treating them for dinner in exchange for their hospitality. The court accepted Lori's declared expenses and allocated her $200 per month for these expenses. It also gave her $100 per month for entertainment. It bears noting that Todd listed $1,000 for his monthly travel and entertainment costs, which he attributed to "traveling all over the west." The court allowed him to claim these monthly expenses. Under these

circumstances and when the court also found that the marital standard of living included regular vacations, we cannot say that the district court abused its discretion in assessing Lori's monthly expenses related to extracurricular activities.

¶48    Third, Todd challenges Lori's expenses for donations and gifts. The district court found that Lori's reasonable monthly expenses included $100 for donations and $200 in gifts, accepting Lori's figures in her financial declaration. Likewise, the court accepted Todd's figures of $100 for donations and $200 in gifts. In light of the fact that the court allocated the same amount for each party to spend on donations and gifts, Todd has not shown that the district court abused its discretion. *Cf. Rule v. Rule*, 2017 UT App 137, ¶ 26, 402 P.3d 153 (inferring that the parties' current expenses were based on the marital standard of living when "the majority of the expenses in [the husband's current] financial declaration are identical in amount to those identified as marital expenses in [the wife's current] financial declaration"); *Sauer v. Sauer*, 2017 UT App 114, ¶ 10, 400 P.3d 1204 (seeing "no impropriety in the trial court's decision to impute housing needs to [the wife] in the same amount as [the husband] had claimed was reasonable for him").

¶49    Fourth, Todd complains that the district court adjusted his monthly dental expenses down from $900 to $50. Todd's financial declaration listed $900 per month in dental expenses, noting that he spent $14,000 on such expenses in 2016. The court relied on Todd's testimony to find that these expenses were "fully paid and not recurring."[13] On that basis, the court adjusted

---

13. On appeal, Todd implies that "[i]t is very likely he will continue to have ongoing Dental Expenses" given his age. Yet when asked at trial whether he expected his dental expenses to be ongoing, he testified, "No, I don't think so." He also testified that his "dental [expenses] will probably go down."

Todd's dental expenses down to $50 per month. Though Todd disagrees with this decision, he has not shown that the district court exceeded the bounds of its discretion.[14]

¶50   Fifth, Todd complains that the district court improperly reduced his claimed real property maintenance expenses from $1,000 to $100 per month.[15] Todd listed $1,000 as his monthly real estate maintenance expenses on his financial declaration. In the court's findings on Todd's expenses, it adjusted this expense to $100 per month given Todd's testimony about "numerous completed and paid-for projects such as a new deck, new windows, a new roof, [and] replacement of furnace and appliances." Yet when the court totaled Todd's monthly expenses, it did not make that downward adjustment, effectively accepting Todd's claimed real estate maintenance expenses at $1,000. Despite the court's stated intention to adjust Todd's expenses downward, the court did not make the adjustment, and thus Todd has not shown how he was prejudiced by any alleged

---

14. In connection with his complaint about his dental expenses, Todd also briefly claims that the court's decision allocating $450 per month to Lori for health care expenses is unsupported by the evidence. But Lori's financial declaration provided evidentiary support for this figure, and Todd has not explained why it is insufficient to support the court's finding. *See Sauer v. Sauer*, 2017 UT App 114, ¶ 12, 400 P.3d 1204 (concluding that the district court did not clearly err in finding that a spouse had unmet needs when her financial declaration supported that finding).

15. Todd also suggests that Lori's competing expenses for real property maintenance lack evidentiary support. But Lori's financial declaration listed $550 per month for real property maintenance, and Lori testified about that figure at trial. Todd has not demonstrated on appeal that this evidence was legally insufficient to support the district court's finding.

error regarding real estate maintenance expenses. *See* Utah R. Civ. P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").

## II. Attorney Fees

¶51 We first address Todd's challenge to the district court's award of attorney fees to Lori. We then consider Lori's request for her attorney fees incurred on appeal.

### A. The District Court's Award of Attorney Fees

¶52 Utah Code section 30-3-3(1) permits a court to award attorney fees to a party in certain divorce proceedings "to enable [a] party to prosecute or defend the action."[16] Utah Code Ann. § 30-3-3(1) (LexisNexis 2013). "Such an award must be based on evidence of the receiving spouse's financial need, the payor spouse's ability to pay, and the reasonableness of the requested fees." *Dahl v. Dahl*, 2015 UT 79, ¶ 168 (cleaned up). The decision to award attorney fees under Utah Code section 30-3-3 and the

---

16. Section 30-3-3(1) allows for an award of attorney fees, as relevant here, in actions "to establish . . . alimony." Utah Code Ann. § 30-3-3(1) (LexisNexis 2013). This court has considered actions to modify alimony to fall within this provision. *See, e.g.*, *Gore v. Grant*, 2015 UT App 113, ¶¶ 25, 31, 349 P.3d 779 ("The modification proceedings . . . involved a request to modify child support, in other words, to establish a different support obligation."). However, the statute "does not provide for attorney fees to defend an action to *terminate* alimony." *Scott v. Scott*, 2017 UT 66, ¶ 32, 423 P.3d 1275. Todd's petition to modify sought to terminate or reduce alimony, but Todd makes no argument that section 30-3-3(1) could not support an award here. Thus, we assume the provision applies.

amount thereof "rests in the sound discretion of the district court." *Id.*; *Davis v. Davis*, 2003 UT App 282, ¶ 14, 76 P.3d 716. We also require that such attorney fees awards be "based on sufficient findings." *Davis*, 2003 UT App 282, ¶ 14 (cleaned up).

¶53    The district court ordered Todd to pay half of Lori's attorney fees under Utah Code section 30-3-3(1). In support, the court cited the parties' financial declarations, their assets, Todd's ability to pay, and Lori's needs. The court found that Lori paid her attorney fees with her credit card, was living "on a month-to-month basis," had not accumulated additional savings since the divorce, and had a budget that did "not allow for any extraordinary expenses such as litigation fees." In contrast, the court found that Todd paid his attorney fees in full, had no debt, had accumulated substantial savings since the divorce, had $1.5 million from which to draw for expenses and other needs, and had the ability to pay some of Lori's attorney fees.

¶54    The district court also determined that Lori's reasonable attorney fees and costs totaled $19,025. In so doing, the court noted that it had directed Lori's counsel to compile an updated fee affidavit after trial and that the updated affidavit contained a larger fee amount than that originally submitted. Todd objected to the larger amount, accusing Lori's counsel of bad faith and lying. The court found that these accusations were both uncivil and inaccurate. It compared the initial affidavit and the updated affidavit, and it found that the only difference is that the initial affidavit "contains only an estimate of the time necessary to prepare for trial, while the [updated] affidavit contains the actual time billed" for the three months around the time of trial. The court found "no inflation of fees or dishonesty" on the part of Lori's counsel; it instead found that Lori's counsel "did high-quality work quite efficiently, with respect to the limited resources of her client." Having rejected Todd's objection, the court ordered Todd to pay $9,512.50 to Lori, representing half of her total fees.

¶55 Todd makes three arguments challenging the attorney fees award. First, he asserts that Lori's counsel "should have identified how much [Lori] has paid her and whether she has an outstanding balance," suggesting that Lori had "already paid" her attorney and thus had no actual financial need for assistance paying those fees. This argument misses the mark. The court found that Lori used her credit card to pay her attorney fees and that she still owed her credit card company. Thus, we are not persuaded that the court erred in finding that Lori had a need for attorney fees.

¶56 Second, Todd complains that $19,025 in fees was unreasonable in light of Lori's counsel's initial representation that her fees totaled around $10,892. The district court found that this difference was explained by the fact that the initial figure was "only an estimate" of Lori's counsel's time preparing for trial, whereas the updated figure was "the actual time billed." The court also found that Lori's counsel's updated figure represented her reasonable fees and, contrary to Todd's assertions, contained no inflated fees or dishonesty. Todd disagrees with the court's assessment, but he has not established any abuse of discretion in its decision.

¶57 Third, Todd complains that ordering him to pay half of Lori's attorney fees is "inherently unfair" when he has a shortfall while Lori has a surplus. The district court's findings in connection with its attorney fees decision rely on its alimony findings regarding Lori's needs and Todd's ability to pay—findings that we have concluded do not adequately show the steps the court took to reach its decision. *Supra* ¶¶ 39–40, 43–44. Thus, although we reject two of Todd's arguments challenging the award of attorney fees, we remand for the district court to enter more detailed findings on Lori's financial need and Todd's ability to pay and, if necessary, for the court to reconsider the attorney fees award in light of any altered figures. *See Taft v. Taft,*

2016 UT App 135, ¶¶ 88–89, 379 P.3d 890; *Andrus v. Andrus*, 2007 UT App 291, ¶ 19, 169 P.3d 754.

B.      Attorney Fees on Appeal

¶58     Lori requests an award of attorney fees incurred on appeal. "Generally, when the trial court awards fees in a domestic action to the party who then substantially prevails on appeal, fees will also be awarded to that party on appeal." *Wollsieffer v. Wollsieffer*, 2019 UT App 99, ¶ 31 (cleaned up). Given the mixed result on appeal, we decline to award Lori attorney fees on appeal. *See Andrus*, 2007 UT App 291, ¶ 19.

CONCLUSION

¶59     We affirm the district court's alimony decision in many respects. But we conclude that the district court's findings regarding Lori's needs and Todd's ability to pay are not adequately detailed to permit meaningful appellate review. Accordingly, we remand to the district court with instructions to enter more detailed findings on those issues. After making those findings, the court may modify its award of attorney fees and alimony if warranted.

_____