**2024 UT App 148**

## THE UTAH COURT OF APPEALS

MEGAN LUNT,
Appellee,
*v.*
DREW E. LUNT,
Appellant.

Opinion
No. 20220596-CA
Filed October 18, 2024

Third District Court, Salt Lake Department
The Honorable Patrick Corum
No. 194902053

Julie J. Nelson, Attorney for Appellant

Sara Pfrommer, Attorney for Appellee

Matt Wadsworth, Attorney for Amicus Curiae in
support of Appellee[1]

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

ORME, Judge:

¶1　In this appeal, Drew E. Lunt challenges alimony and child support awards entered in Megan Lunt's favor as part of their

---

1. Appellee assigned her interest in the business at issue in this appeal to Matt Wadsworth, who acted as her attorney in the proceedings before the trial court. As Appellee no longer has a stake in the outcome of the distribution of the business, Wadsworth was granted permission to file an amicus brief urging affirmance of the trial court's division of the business, while Appellee's brief is limited to the issues related to alimony and child support.

divorce action. He argues that the trial court erred as a matter of law when it determined the parties' financial needs and gross incomes. He also challenges the court's valuation of his business, arguing that the court erroneously determined that only 5% of the business's value is attributable to his personal goodwill. Because the trial court's determination regarding the parties' financial needs was based on a misapplication of law, we reverse and remand the matter for the court to enter the requisite findings and to reevaluate the alimony award. But we otherwise affirm the trial court's decisions.

BACKGROUND

¶2    The parties married in 2000 and have three children together, two of whom were still minors at the time of trial. Drew,[2] an attorney, worked for various law firms but eventually went out on his own to develop an employment law website business (the Business), of which he is the sole shareholder. For most of the marriage, Megan worked in the home, but in 2014, she began working full-time as a schoolteacher.

¶3    In 2019, Megan filed a petition for divorce. The trial court entered temporary orders that, among other things, awarded Megan monthly child support and alimony. Prior to trial, the parties stipulated to joint physical and legal custody of the two minor children, and the trial court entered an order to that effect.

¶4    In October 2020, the trial court held the first bench trial in this matter, following which it entered findings of fact and conclusions of law regarding, in relevant part, alimony, child support, and the valuation of the Business. Both parties subsequently filed post-trial motions. As a result, the court held a

---

2. Because the parties share the same last name, we refer to them hereafter by their first names, with no disrespect intended by the apparent informality.

second bench trial in February 2022 to consider additional testimony from the parties' expert witnesses, and it later entered supplemental findings of fact and conclusions of law regarding alimony and the valuation of the Business. We recount the combined findings and conclusions below.

*Alimony and Child Support*

¶5     For child support and alimony purposes, Drew asked the trial court to count as part of Megan's gross income, in addition to her salary as a teacher, (1) her employer-paid healthcare and retirement benefits, (2) income she received for previously operating an annual two-week summer camp, and (3) charitable donations she received from her church. The trial court declined to count any of these three sources as part of Megan's gross income.

¶6     *Employer-Paid Benefits.* In addressing Megan's healthcare and retirements benefits, the court stated that for child support purposes, Drew's "approach appears inconsistent with both the plain language and legislative intent behind the exhaustive list of gross income sources found in Utah Code Ann. § 78B-12-203."[3] The court also noted that many of the decisions from other states that permit employer-paid benefits to be counted as gross income "rest their analysis on the notion that certain benefits are received in lieu of additional salary" and no evidence was presented that Megan had that option. For alimony purposes, the court stated that it was "similarly not persuaded that [Megan's] employer-paid benefits should be included in the income calculation" or that Utah law even permitted such benefits to be considered in that context. And in any event, the court stated that it was not "clear that it would ultimately make any difference in the alimony determinations as any additional 'income' regarding these benefits would be offset directly by the corresponding

---

3. Utah Code section 78B-12-203 has recently been renumbered as section 81-6-203.

additional need created by considering the employer-paid benefit to be income."

¶7    *Summer Camp.* Between 2016 and 2019, Megan organized and operated an annual two-week science summer camp. Megan did not operate the camp in 2020, and the court found she credibly testified as to compelling reasons why it was not held then and why she had no plans to operate the camp again in the future. Specifically, "the camp name and logo had elicited a cease and desist letter, neither of her children had any interest in helping with the camp any longer, she currently lacked a physical location, [Drew] would no longer be able to help with the website and billing, and the [COVID-19] pandemic made the camp problematic if not impossible to operate." The court stated that "[a]ny one of these reasons would suffice to credibly explain [Megan's] assertion that she would not be engaged in the camp," and it thus declined to count Megan's previous earnings from the summer camp as part of her gross income. The court further noted that the camp "is not a current endeavor and was not at the time of trial," and even if Megan's discontinued participation in the camp "could be viewed as a form of underemployment," given the reasons to which Megan credibly testified, the court found that such underemployment was "not wholly voluntary."[4] The court also stated that Megan was otherwise employed full time as a school teacher and that it "is not in the habit of ordering parties to work more than one full-time job except under those very limited circumstances identified in the law." It also characterized the camp as "a relatively short-term side business" that "was always above and beyond [Megan's] normal, full-time job and,

---

4. The trial court noted that while a finding regarding voluntariness is no longer statutorily mandated, it considered that factor to be "highly relevant" and to weigh "strongly" in the income imputation analysis. *See Merrill v. Merrill*, 2024 UT App 125, ¶ 33.

thus, by statute excluded for child support purposes." *See* Utah Code Ann. § 78B-12-203(2) (LexisNexis 2022).[5]

¶8     *Charitable Donations*. In her most recent financial declaration, Megan listed $1,000 as monthly income under "Church Help." Drew argued that this should be counted as part of her gross income for alimony purposes because she did not provide evidence that such payments would not occur in the future. But the court noted that Megan had testified that the charitable donations were expected to cease and that there had already been discussions to that effect. The court stated that because there was "no other evidence" regarding those charitable donations, it was unable to find that the donations should be counted as income. Additionally, the court stated that "inclusion of charitable donations received by either of the parties from anyone let alone a church as income would seemingly work to defeat one of the primary policy purposes behind alimony and may ultimately and improperly make the donating party responsible for the receiving party in perpetuity."

¶9     Accordingly, for child support and alimony purposes, the trial court set Megan's gross monthly income at $5,043.75, which represented her schoolteacher salary.

¶10    The court next addressed Drew's gross monthly income. Because Drew was the sole proprietor of the Business, the court applied the statutory formula set forth in Utah Code section 78B-12-203(4)(a) of subtracting "[o]nly those expenses necessary to allow the business to operate at a reasonable level" from the gross receipts. The court agreed with Megan's expert witness, who used this approach to calculate Drew's 2019 total gross income. Megan's expert did not take the COVID-19 pandemic into account, stating that there were indications that "things are coming back and there's still a lot of employment related issues."

---

5. Because our Legislature has since amended and renumbered some of the statutes at issue in this appeal, we cite the version of the Utah Code in effect at the relevant time.

Accordingly, the court determined Drew's income for alimony and child support purposes to be $12,384 per month. In its supplemental findings of fact and conclusions of law, the court stated that this amount "includes Drew's wage compensation for services rendered as well as the profits, distributions, and access to retained earnings that he has as an owner" of the Business.

¶11 Based on each party's gross monthly income and the parenting schedule, the court awarded Megan $492 per month in child support.

¶12 Next, as part of its alimony ruling, the trial court addressed the parties' standard of living. The court determined that the evaluation of the parties' standard of living at the time of separation—and not at the time of trial—was appropriate in this case. The court did not consider evidence Megan proffered regarding the marital standard of living in 2013—when Drew "was at his high water mark of salary as an attorney"—because there was "no true support in law or fact" for the contention that the 2013 marital standard of living should be used rather than the standard at the time of the parties' separation. Conversely, Drew's expert testified regarding the parties' standard of living from March 2017 until their separation in March 2019, which he calculated to be $9,016 per month. The court found this valuation "to be an accurate and reasonable estimate of the marital standard of living for that two-year period" but made a few minor adjustments and ultimately concluded that the parties' marital standard of living at the time of separation was $8,779.50 per month.

¶13 Next, the court addressed the parties' financial needs. Based on Megan's monthly net earned income and child support award, the court determined that meeting the $8,779.50 marital standard of living left her with a monthly shortfall of $4,208. And based on Drew's monthly net earned income minus the monthly child support obligation, the court determined that he was left with a monthly shortfall of $624. Based on "the length of the marriage, the significant disparity in incomes between the parties

to meet the marital standard, the continuing improvement of and overall upward trajectory of [the Business], and other circumstances," the court found "it fair and equitable that the parties' shortfall should be equally divided," leaving each party with a monthly shortfall of $2,416. Accordingly, the court awarded Megan $1,792 per month in alimony.

¶14 Following the second bench trial, Drew did not present any additional evidence related to alimony or Megan's needs. And after considering prior testimony, the court was not persuaded that its initial findings regarding alimony should be altered. The court specifically stated that "the value attributed to the marital standard of living was provided by [Drew's] expert . . . and backed by credible information to support the amount." But because the court found that the alimony awarded in the temporary orders "was grossly inadequate based on the net income actually generated by the [B]usiness," it made the $1,792 monthly alimony award retroactive to the date Megan filed the divorce petition, and it ordered Drew to pay the difference within 90 days.

*The Business's Valuation and Personal Goodwill*

¶15 After graduating from law school in 2003, Drew worked for the National Labor Relations Board for approximately three and a half years. Next, he worked for law firms in Tennessee and Georgia that specialized in employment law. Drew holds himself out as "an expert in researching information about employment laws in all 50 states."

¶16 In 2008, Drew developed a website, employmentlawhand book.com (elh.com),[6] "to provide information related to labor law as a marketing tool for his legal practice while he worked as an

---

6. We follow the parties' and the trial court's lead in using this shorthand to refer to employmentlawhandbook.com, but it should be noted that elh.com is not actually a website associated with the Business.

attorney" for an employment law firm in Tennessee. Notably, elh.com does not offer legal advice. By the time of the parties' separation in 2019, the Business had expanded to include an additional website: theluntgroup.com. Of the two websites, elh.com produces "the vast majority" of the Business's revenue.

¶17 As summarized by the trial court, elh.com advertises Drew as "an experienced employment law attorney with previous employment at various law firms and the National Labor Relations Board," but the website does not prominently feature his name or qualifications. Drew is the Business's sole equity holder, officer, and employee, although consultants and independent contractors contribute to the Business's normal operations. The court found that "the Business is a single-operating entity" and that Drew "has at all times operated the Business as a single, unified business with multiple streams of revenue."

¶18 In 2012, the Business began generating revenue by hosting Google ads on the websites. In 2014, the family relocated to Utah, and Drew began working exclusively on the Business. The trial court found that Drew alone "designs [the] websites, redesigns them, monitors them, maintains them, and troubleshoots them when they are not working properly." But because elh.com had "been developed over several years," by the time of the first bench trial the website needed only "minor updates to pages or blog posts to maintain its web traffic" and most of those updates "are currently out-sourced to independent contractors and not done by [Drew]." Drew also has "sole editorial responsibility for content on the website, either authoring content himself or reviewing and editing content generated by subcontractors and contributors." For the websites, Drew "has researched or caused to be researched statutes for over 200 employment law topics for all 50 states and the District of Columbia." According to the trial court, "This content has been and will continue to be critical to the success and advertising revenue of the websites." Indeed, the trial court noted the acknowledgement of Megan's expert that the content is "something that cannot be easily replaced" and is "something you

could only build up over time." On the other hand, the court also found that "the content of many of elh.com's web pages have remained static for many years, including specifically those web pages that were indicated to be generating the most ad revenues."

¶19　Also, in 2014 and 2015, the Business began offering human resources consulting, ebooks, and "a membership area." Drew has published approximately 100 ebooks on employment law and authored or edited numerous employment law handbooks. In 2018, Drew hired an employee to focus on the consulting side of the Business so that he could direct his attention to other aspects of the Business. But by the time of the first bench trial, the employee had become an independent contractor.

¶20　One of the issues the trial court addressed in valuing the Business was whether any of its value was attributable to Drew's personal goodwill. The parties each took all-or-nothing positions on this issue, with Drew arguing that the Business's goodwill was "largely or entirely" attributable to Drew personally and Megan arguing that the goodwill was entirely attributable to the Business as an institution. The court concluded that the Business's goodwill was largely institutional, but it stated that although it did "not believe, nor would it find, that there is absolutely zero personal goodwill" in the Business, Drew's all-or-nothing trial strategy left the court with no evidence with which it could determine a specific, diminished amount for the personal goodwill. Accordingly, the court stated that "based upon [the] lack of evidence," Drew had "not met his burden as to personal goodwill," and it held "that any goodwill associated with the Business should be considered institutional or enterprise goodwill for purposes of division."

¶21　In reaching this conclusion, the court addressed whether the Business needed Drew to continue to operate, and the degree to which the Business's success was tied to Drew's reputation for competency. The court disagreed with Drew's assertion that "his personal relationships with the independent contractors, clients, and vendors are critical to the Business' success and

irreplaceable" because there was no evidence presented that the company the Business uses to manage ads or the independent contractors would not work with another person at the helm. But the court did find that although elh.com did not offer legal advice, the Business would not "be anywhere near as successful and profitable if operated primarily by a non-attorney" and "that the Business's reputation, status, and success is enhanced to some unspecified degree by having an experienced employment law attorney at the helm." The court further found that Drew's qualifications, education, training, and expertise in employment law and human resources "have contributed to some degree in the development, maintenance and success of elh.com."

¶22   But the court also found that "the Business does not depend on [Drew's] reputation for competency to a significant or quantified degree," and it "wholly reject[ed]" Drew's contentions that the Business is dependent on him and that it would not be able to continue operating without him. The court stated that "given how the website is set up and constructed, it is highly likely that very few, if any, of the users to elh.com," which is responsible for the "vast majority" of the Business's revenue, "even realize that [Drew] (or any attorney for that matter) is involved." Indeed, the court noted that in the last calendar year, Drew had not been "the primary, or even secondary or tertiary, blog post author for elh.com" and that he "spends very little time on elh.com"—having authored only four blog posts for the website in the past two years. The court further noted that elh.com "is driven by web-based ads by website viewers that could be anywhere in the world and have no relationship with [Drew]—let alone even know his name." The court agreed with Megan's expert that any goodwill associated with elh.com "is inherent within the domain name and the historical content that has existed on the site since 2008." Accordingly, the court held that elh.com "is established and has intangible value distinct from any entity or any individual."

¶23   For these reasons, in its initial findings of fact and conclusions of law, the court concluded that the Business's

goodwill was institutional and therefore subject to division as part of the marital estate.

¶24 Following the second bench trial, at which the court heard additional testimony from the parties' expert witnesses, the court amended its determination regarding Drew's personal goodwill. The court stated that its original valuation of the Business did not allocate anything for personal goodwill because there was "limited credible evidence that Drew's personal presence (as opposed to any other knowledgeable employment professional) is necessary for the continued operation of the [B]usiness" and because "there was no evidence presented from which the court could reliably conclude how much [Drew's] status as an attorney adds to the [B]usiness." But following the second bench trial, the court "concluded that the evidence supports a finding that there is some nominal value attributable to Drew's personal goodwill," and it allocated 5% of the Business's total value to Drew's personal goodwill.

¶25 Based on that and other adjustments, the court valued the Business at $320,345, which reflected the 5% deduction for Drew's personal goodwill. The court then awarded half of the Business's value to Megan, subject to a secured payment plan.

¶26 Drew appeals.

ISSUES AND STANDARDS OF REVIEW

¶27 Drew raises several challenges to the trial court's alimony and child support awards. "In divorce actions, a district court is permitted considerable discretion in adjusting the financial and property interests of the parties, and its actions are entitled to a presumption of validity." *Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134 (quotation simplified). A court abuses its discretion "only if no reasonable person would take the view adopted by the trial court." *Id.* (quotation simplified). Under this standard, we will reverse if, as

relevant here, "there was a misunderstanding or misapplication of the law resulting in substantial and prejudicial error." *Id.* (quotation simplified).

¶28    Drew also challenges the court's valuation of the Business, specifically, its decision to allocate only 5% for Drew's personal goodwill, which he asserts also resulted in impermissible double counting of his earning capacity. "In a divorce proceeding, the trial court is accorded considerable discretion in its valuation . . . of marital property," *Knowlton v. Knowlton*, 2023 UT App 16, ¶ 43, 525 P.3d 898 (quotation simplified), *cert. denied*, 531 P.3d 730 (Utah 2023), and its decision is likewise "entitled to a presumption of validity," *Erickson v. Erickson*, 2022 UT App 27, ¶ 16, 507 P.3d 824 (quotation simplified). We will thus generally "uphold a district court's valuation of marital assets as long as the value is within the range of values established by all the testimony, and as long as the court's findings are sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached." *Rothwell v. Rothwell*, 2023 UT App 50, ¶ 49, 531 P.3d 225 (quotation simplified), *cert. denied*, 537 P.3d 1011 (Utah 2023). We also "defer to the district court's findings of fact related to property valuation . . . unless they are clearly erroneous." *Erickson*, 2022 UT App 27, ¶ 16 (quotation simplified).

ANALYSIS

I. Alimony and Child Support

¶29    Drew disputes the trial court's alimony and child support awards, contending that the court abused its discretion when it determined Megan's financial needs and the parties' incomes. The financial needs determination concerns only the alimony award, while the income determination is germane to both the alimony and child support awards.

A.      Megan's Financial Needs

¶30    In evaluating a party's alimony claim, trial courts must engage in a multi-factor inquiry previously set forth in Utah Code section 30-3-5(10)(a).[7] Courts "must make sufficiently detailed findings of fact on each statutory factor to enable a reviewing court to ensure that the trial court's discretionary determination was rationally based upon these factors, which requires including enough subsidiary facts to disclose the steps by which the ultimate alimony conclusion was reached." *Rule v. Rule*, 2017 UT App 137, ¶ 11, 402 P.3d 153 (quotation simplified).

¶31    The first three factors listed in section 30-3-5(10)(a) are frequently "referred to as the *Jones* factors."[8] *Dahl v. Dahl*, 2015 UT 79, ¶¶ 94–95, 459 P.3d 276 (quoting *Jones v. Jones*, 700 P.2d 1072, 1075 (Utah 1985)). They are (1) "the financial condition and needs of the recipient spouse;"[9] (2) "the recipient's earning capacity or ability to produce income, including the impact of diminished workplace experience resulting from primarily caring for a child of the payor spouse;" and (3) "the ability of the payor spouse to provide support." Utah Code Ann. § 30-3-5(10)(a)(i)–(iii) (LexisNexis Supp. 2022). The "party seeking alimony bears the burden of demonstrating to the court that the *Jones* factors support an award of alimony." *Dahl*, 2015 UT 79, ¶ 95. This burden is most

---

7. Effective September 1, 2024, our Legislature repealed Utah Code section 30-3-5. The factors that trial courts must consider in determining alimony are now set forth in Utah Code section 81-4-502(1).

8. The *Jones* factors are now found in Utah Code section 81-4-502(1)(b)–(d).

9. Section 81-4-502(1)(b) now provides that trial courts shall consider "the financial condition and needs of the payee, provided that the payee may show financial needs by itemizing expenses present during the marriage rather than by itemizing post petition expenses."

commonly satisfied by providing "the court with a credible financial declaration and supporting financial documentation." *Wellman v. Kawasaki*, 2023 UT App 11, ¶ 14, 525 P.3d 139 (quotation simplified). But in cases where the alimony claimant does not provide proper documentation, and "where the evidence and equity permit," *id.* ¶ 24, a court should attempt to make findings regarding the factors based on circumstantial and testimonial evidence, *id.*; *Munoz-Madrid v. Carlos-Moran*, 2018 UT App 95, ¶ 9, 427 P.3d 420. *See Dahl*, 2015 UT 79, ¶ 116.

¶32 At issue here is the first *Jones* factor, i.e., the court's determination—or lack thereof—regarding Megan's financial needs. Drew argues that the trial court abused its discretion when it substituted the parties' standard of living at the time of separation (with a few minor adjustments) for Megan's financial needs.[10] We agree.

¶33 An alimony award should "advance, as much as possible, the primary purposes of alimony," one of which is "to get the parties as close as possible to the same standard of living that existed during the marriage." *Rule*, 2017 UT App 137, ¶ 14 (quotation simplified). As such, when evaluating the first *Jones* factor, the trial court "should assess the needs of the parties, in light of their marital standard of living." *Id.* ¶ 19 (quotation simplified). But because "[t]he receiving spouse's needs ultimately set the bounds for the maximum permissible alimony award," *id.* ¶ 17, "there is usually no need for a trial court to make a separate specific finding regarding the overall marital standard of living as measured by the total amount of money spent each month by the couple while they were married," *Fox v. Fox*, 2022 UT App 88, ¶ 19, 515 P.3d 481 (quotation simplified), *cert. denied*, 525 P.3d 1263 (Utah 2022). Rather, when assessing "the needs of the parties, in light of their marital standard of living," courts

---

10. Drew also argues that Megan failed to carry her burden of proving her financial needs. Because we reverse the alimony award based on the trial court's erroneous reliance on the marital standard of living, we do not reach this argument.

"must determine the parties' needs reasonably incurred, calculated upon the standard of living enjoyed during the marriage." *Id.* ¶ 20 (quotation simplified).

¶34 This is not what the trial court did in this case. Although each party proposed findings on their individual financial needs, the court did not enter any findings regarding their reasonable expenses as part of its alimony award. Instead, the court largely adopted the valuation of the parties' marital standard of living provided by Drew's expert, with a few minor adjustments, and substituted it for each party's financial needs. The court then proceeded to the equalization step of the alimony calculus, *see Rule*, 2017 UT App 137, ¶ 21, by subtracting each party's net income from the marital standard of living amount and equalizing the shortfall, leaving each party with a monthly shortfall of $2,416. Based on this calculation, the court awarded Megan $1,792 per month in alimony.

¶35 As discussed above, because the recipient spouse's reasonable financial needs—not the marital standard of living—represents the maximum allowable amount for an alimony award, *id.* ¶ 17, courts must enter findings regarding "the parties' needs reasonably incurred," *id.* ¶ 19 (quotation simplified). Accordingly, because the trial court's alimony award was based on the marital standard of living instead of the parties' reasonable expenses, the award is the result of a misapplication of law, which constitutes an abuse of discretion.[11] *See Gardner v. Gardner*, 2019 UT 61, ¶ 18, 452 P.3d 1134.

---

11. Although the focus is on the parties' reasonable needs, as measured by their reasonable expenses, the marital standard of living—while not obviating the necessity to determine the needs of the parties—is a key consideration in evaluating the reasonableness of their expenses.

¶36   For this reason, we reverse the alimony award and remand the matter to the trial court to enter appropriate findings regarding the parties' reasonable expenses and to reassess alimony in light of those findings.

B.   The Parties' Incomes

¶37   Child support obligations are calculated using the parents' adjusted gross incomes. *Barrani v. Barrani*, 2014 UT App 204, ¶ 11, 334 P.3d 994. Utah Code section 78B-12-203(1), which was in effect at the relevant time,[12] provided that

> "gross income" includes prospective income from any source, including earned and nonearned income sources which may include salaries, wages, commissions, royalties, bonuses, rents, gifts from anyone, prizes, dividends, severance pay, pensions, interest, trust income, alimony from previous marriages, annuities, capital gains, Social Security benefits, workers' compensation benefits, unemployment compensation, income replacement disability insurance benefits, and payments from "nonmeans-tested" government programs.

Additionally, section 78B-12-203(2) directed that "[i]ncome from earned income sources is limited to the equivalent of one full-time 40-hour job" unless "during the time before the original support order, the parent normally and consistently worked more than 40 hours at the parents' job," in which case "the court may consider this extra time as a pattern in calculating the parent's ability to provide child support."

¶38   For individuals such as Drew whose income is derived from self-employment or the operation of a business, section

---

12. As previously noted, Utah Code section 78B-12-203 has since been renumbered, with adjustments, as section 81-6-203.

78B-12-203(4)(a) directed that for child support purposes, the gross income from such endeavors "shall be calculated by subtracting necessary expenses required for self-employment or business operation from gross receipts," and that "[o]nly those expenses necessary to allow the business to operate at a reasonable level may be deducted from gross receipts."

¶39 For alimony purposes, Utah caselaw directs that "it is appropriate and necessary for trial courts to consider all sources of income." *Hansen v. Hansen*, 2014 UT App 96, ¶ 14, 325 P.3d 864 (quotation simplified), *cert. denied*, 337 P.3d 295 (Utah 2014). *See Eberhard v. Eberhard*, 2019 UT App 114, ¶ 21, 449 P.3d 202 ("District courts must be able to consider all sources of income that were used by the parties during their marriage to meet their self-defined needs, from whatever source—overtime, second job, self-employment, etc., as well as unearned income.") (quotation simplified). But while the "caselaw directs district courts to *consider* all sources of income when determining alimony, it does not dictate that all sources of income be *counted* as income received by a spouse for that purpose." *Eberhard*, 2019 UT App 114, ¶ 21 (emphases in original).

¶40 In making both child support and alimony determinations, "courts have broad discretion to select an appropriate method of assessing a spouse's income, including determinations of income imputation," under which standard "appellants bear a heavy burden" of establishing that "no reasonable person would take the view adopted by the trial court." *Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 13, 508 P.3d 612 (quotation simplified).

### 1. Megan's Income

¶41 Drew argues that the trial court erred, as a matter of law, when it did not count the charitable donations Megan received from her church, her summer camp income, and her employer-paid benefits toward her gross income. We address each argument in turn.

¶42 **Charitable Donations.** As part of her financial declaration, Megan listed $1,000 monthly in donations from her church as income, which she testified was a rental subsidy. When asked whether she expected the charitable donations to cease in the future, Megan replied, "Yes, . . . they've already talked about [it]."

¶43 Drew argues that the charitable donations were a "gift" as contemplated under section 78B-12-203(1) and therefore were eligible to be counted as part of Megan's gross income. He further asserts that none of the reasons the trial court gave for declining to count the donations as part of Megan's income are supported by Utah law:

- Drew argues that the trial court erroneously stated that the "inclusion of charitable donations received by either of the parties from anyone let alone a church as income would seemingly work to defeat one of the primary policy purposes behind alimony," that is, "to prevent the recipient spouse from becoming a public charge," *Rule v. Rule*, 2017 UT App 137, ¶ 14, 402 P.3d 153 (quotation simplified). Drew contends that receiving charitable donations from a church does not make the recipient a "public charge."[13] Rather, he argues, such donations are properly categorized as gifts.

- Drew contends that the court's statement that the donations "are expected to stop in the future and . . . there had already been discussions about them ceasing" is "speculative and therefore irrelevant" because there is no requirement that income be indefinite to be counted. He

---

13. Drew misperceives the trial court's point, which was that the temporary help provided by Megan's church kept her from becoming a public charge.

further asserts that Megan could file a petition to modify when the donations ended.

- Drew argues that the court incorrectly reasoned that counting the $1,000 as income "may ultimately and improperly make the donating party responsible for the receiving party in perpetuity." He again asserts that Megan can file a petition to modify when the donations cease, and he argues that counting the donations as Megan's income would not obligate the church to continue making them.[14]

¶44 None of these points amount to an error of law. Although we agree that the donations are properly characterized as gifts under section 78B-12-203(1), the court was not obligated to count them as part of Megan's gross income. *See Eberhard*, 2019 UT App 114, ¶ 21. Overall, the court expressed unease with counting short-term financial assistance offered by a church as income for alimony and child support purposes. Based on Megan's testimony that there had already been discussion about the donations coming to an end, it was reasonable for the court to decide not to count the donations as part of Megan's gross income going forward—even in light of the option of filing a future petition to modify once the donations ceased. The court also felt uneasy with Megan possibly having to rely on future charitable donations from the church as a result of those donations counting toward her gross income. Although Drew is correct that counting the donations as income would not legally obligate the church to continue providing financial assistance, the church might nonetheless feel duty-bound to aid a member of its congregation in need. For these reasons, the trial court acted within its

---

14. Drew also asserts that the court's reference to there being "no other evidence" regarding the donations is incorrect. He points to Megan's bank statements showing she paid $950 (and not $1,950) in rent, and to her financial declaration in which she specifically listed the $1,000 as "income." But this argument does not implicate a potential legal error.

discretion, and did not commit legal error, when it decided against counting the church's charitable donations as part of Megan's gross income.

¶45 **Summer Camp.** Drew raises two challenges to the court's decision not to count the income Megan earned between 2016 and 2019 for operating an annual two-week summer science camp. First, he argues that the trial court erred as a matter of law when it stated that operating the summer camp "was always above and beyond [Megan's] normal, full-time job and, thus, by statute excluded for child support purposes." Citing Utah Code section 78B-12-203(2), Drew asserts that Utah law "plainly allows a court to consider 'overtime' income if the parent historically earned it."[15]

¶46 Utah Code section 78B-12-203(2) provided that for child support purposes, "[i]ncome from earned income sources is limited to the equivalent of one full-time 40-hour job," and that a trial court "may consider" any time worked in excess of that "[i]f and only if during the time before the original support order, the parent normally and consistently worked more than 40 hours at the parent's job." Notably, the statute's focus is on the number of hours worked per week. And here, it is entirely unclear whether Megan, a schoolteacher whose work responsibilities were presumably reduced over the summer, even worked in excess of 40 hours per week during the two weeks that she operated the summer camp. Moreover, even if she did work more than 40 hours per week during that time, there is also the question of whether doing so for two weeks a year satisfies the statutory

_____

15. Drew also argues that the caselaw holding that a court must consider all sources of income for alimony purposes, which includes a second job, likewise applies to the court's child support determination. But even assuming this is true, that is what the trial court did here. It *considered* Megan's summer camp income even if it decided against *counting* it as part of her gross income. *See Eberhard v. Eberhard*, 2019 UT App 114, ¶ 21, 449 P.3d 202.

requirement that she do so "normally and consistently" enough to allow the court to count that income toward her gross income.

¶47 In any event, we need not decide that here. Even assuming legal error on the trial court's part, such error was harmless. *See Huish v. Munro*, 2008 UT App 283, ¶ 8, 191 P.3d 1242 ("Unless an appellant demonstrates that an error is prejudicial, it will be deemed harmless and no appellate relief is available.") (quotation simplified). If overtime work satisfies section 78B-12-203(2)'s requirements to be counted toward gross income, the statute still gives the trial court discretion in deciding whether to do so. Here, at the beginning of its summer-camp discussion, the court expressly stated that it "is not in the habit of ordering parties to work more than one full-time job except under those very limited circumstances identified in the law." Such a position certainly does not exceed the limits of reasonableness.[16] Additionally, the court was persuaded by the reasons Megan gave as to why she did not operate the summer camp in 2020 and did not intend to do so again in the future. The court therefore concluded that to the extent Megan was underemployed, it was "not wholly voluntary," which it considered "highly relevant" to the income imputation analysis.[17] Accordingly, we are not persuaded that

---

16. For this reason, although Megan did receive income from the summer camp in 2019, the trial court did not exceed its discretion in not taking that income into account when it made the alimony award retroactive to April 2019, when Megan filed the petition for divorce.

17. A finding of whether underemployment is voluntary is no longer a statutory requirement for imputing income. "The current version of the Utah Code requires only that the judge enter findings of fact as to the evidentiary basis for the imputation." *Merrill v. Merrill*, 2024 UT App 125, ¶ 33 (quotation simplified). "Thus, while voluntary unemployment or underemployment may be relevant when considering whether a party is concealing income or shirking in his or her efforts to earn income, a finding

(continued…)

absent the alleged legal error, the court would have decided to count the summer camp income as part of Megan's income analysis.

¶48 Second, Drew argues that "[t]he exclusion of summer camp income is inequitable and therefore an abuse of discretion." He asserts that because the marital standard of living the court adopted when determining the alimony award was based on the two-year period between March 2017 and March 2019, that calculation included the summer camp income. Thus, Drew contends that "[i]t is inequitable to allow Megan's standard of living to be based on income that includes it, and to simply shift the burden of earning that money from Megan to [him]." But in part I.A, we reversed and remanded the issue of the parties' financial needs because the court's determination on that point was erroneously based entirely on the marital standard of living. And, as explained, the marital standard of living, while not a substitute for assessing the parties' reasonable needs, is relevant in that trial courts assess "the needs of the parties, in light of their marital standard of living." *Fox v. Fox*, 2022 UT App 88, ¶ 20, 515 P.3d 481 (quotation simplified), *cert. denied*, 525 P.3d 1263 (Utah 2022). This is not the same as shifting the burden of making up the income Megan historically earned from the summer camp to Drew.

¶49 **Employer-Paid Benefits.** In declining to count Megan's retirement and health insurance employer-paid benefits as gross income, the court stated that for child support purposes, Drew's "approach appears inconsistent with both the plain language and legislative intent behind the exhaustive list of gross income sources found in Utah Code Ann. § 78B-12-203." The court also noted that many of the courts in other jurisdictions that permit

---

of voluntary unemployment or underemployment is not a prerequisite to imputing income." *Id.* (quotation simplified). The trial court acknowledged this but nonetheless considered that factor to be "highly relevant" to its gross-income analysis. *See supra* note 4.

employer-paid benefits to count toward income "rest their analysis on the notion that certain benefits are received in lieu of additional salary," and the court indicated that there was no evidence presented that this was the case here. *See Hetherington v. Hetherington*, 202 P.3d 481, 487–88 (Ariz. Ct. App. 2008) (listing jurisdictions that do and do not permit the counting of employment-paid benefits for child support purposes). And for alimony purposes, the court stated that it was not evident that the benefits could be included under Utah law. It was also unclear to the court whether "it would ultimately make any difference in the alimony determinations as any additional 'income' regarding these benefits would be offset directly by the corresponding additional need created by considering the employer-paid benefit to be income." Drew asserts, with our emphasis, that section 78B-12-203(1) "is broad and invites a court to consider income from '*any*' source."

¶50 But we need not definitively decide this issue. Notably, in declining to count the employer-paid benefits, the court did not conclusively hold that it was not permitted to do so under Utah law. Rather, it expressed a reluctance to do so given the absence of express precedent and statutory authority. This reluctance is further emphasized by the court's mention of the lack of evidence as to whether Megan had the option to be paid in lieu of the benefits, which consideration was not outside the realm of reasonableness as such benefits would not constitute income that could be used to directly assist with the care of children. Indeed, the various sources of income listed in section 78B-12-203(1) result in direct contributions to the parents' bank accounts, whereas employer-paid health insurance and retirement benefits are not readily available to provide direct monetary support for the care of children. As such, the court acted within its discretion when it declined to count those benefits in calculating Megan's gross income.

¶51 The court also did not abuse its discretion when stating that, for alimony purposes, it was uncertain whether considering the health and retirement benefits would be helpful as they would

then be offset by the reasonable-expenses factor the court is statutorily required to consider. We cannot say that is a position that "no reasonable person would take." *See Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 13, 508 P.3d 612 (quotation simplified).

¶52 For these reasons, the trial court did not err as a matter of law when it declined to count the charitable donations, summer camp income, and employer-paid benefits as part of Megan's gross income.

2.    Drew's Income

¶53 In calculating Drew's gross income, the court adopted the calculation provided by Megan's expert witness, which was based on Drew's 2019 total gross income. The expert's calculations did not take the COVID-19 pandemic into account. He testified there were indications that "things are coming back and there's still a lot of employment related issues."

¶54 Drew contends that in calculating his gross income, the trial court erred by not taking the Business's COVID-19-related losses into account. At the first bench trial, held in October 2020, Drew presented evidence that the Business's gross revenue significantly decreased in June, July, and August 2020.[18] Drew's expert witness also testified that "by the date of the trial, we could really see that pattern pan out, that the revenue wasn't hitting as high of growth" and "that revenue was stalling."

¶55 But the court expressly adopted the calculations made by Megan's expert because they complied with the statutory requirements of Utah Code section 78B-12-203(4)(a), which was in effect at that time. The court rejected the methodology offered by

---

18. This was the most up-to-date information available at that time. The September figures were still not available at the time of the first bench trial.

Drew's expert that was based on Drew's "unilateral decision that his monthly salary should be set at $6,500 for tax purposes," and which the court stated bore "little, if any weight, in the court's determination based upon the statute." Thus, to the extent the calculations Drew offered took the pandemic into consideration, the trial court declined to adopt them because it determined that the calculations did not comply with statutory requirements. Drew has not asserted that that he presented a calculation to the court that fell more in line with the statute and that also took the pandemic into consideration. Indeed, at the time of the first bench trial, the court had been presented with evidence that revenue had decreased for three months—and it was entirely uncertain whether that trend would continue or whether revenue would recover. Both experts presented differing predictions on this question. Nor does Drew indicate that he presented any evidence of continued declining revenue at the second bench trial held in 2022, which the court held specifically to revisit, among other things, the alimony and child support awards. We thus do not see an abuse of discretion in the court's decision to adopt the calculations made by Megan's expert.

¶56 Drew also contends that the court's error was exacerbated because the court took the pandemic into account when it declined to count Megan's summer camp income as part of her gross income, stating that while the pandemic's "effects are uncertain, it is speculative to assume that 2021 (or 2022 for that matter) will look any different than 2020." He asserts that because the court took the pandemic into consideration when considering Megan's income but not his, the court's findings were internally inconsistent and its gross income determinations were inequitable.

¶57 As an initial matter, the pandemic was one of several reasons that Megan gave, and which the trial court accepted as credible and reasonable, as to why she did not operate the summer camp in 2020 and why she did not intend to do so again going forward. Specifically, as summarized by the court, Megan testified that in addition to the pandemic, "the camp name and

logo had elicited a cease and desist letter, neither of her children had any interest in helping with the camp any longer, she currently lacked a physical location, [and Drew] would no longer be able to help with the business and billing." After listing these reasons, the court stated that "[a]ny one of" them "would suffice to credibly explain [Megan's] assertion that she would not be engaged in the camp." Thus, even if the court had not considered the effects of the pandemic, it is highly unlikely that the court's decision regarding the summer camp income would have been different.

¶58 Furthermore, Drew's employment and Megan's summer-camp employment are intrinsically different. The summer camp was an in-person event at which the participants gathered. The Business, on the other hand, was entirely online and did not pose a risk of transmitting the virus. Additionally, it was not unreasonable, as Megan's expert suggested, that the pandemic might even help the Business due to the novel employment law implications the pandemic and the measures taken to curb it had created.

¶59 For these reasons, the trial court did not abuse its discretion when it did not take the three-month decline in income attributable to the COVID-19 pandemic into consideration when it determined Drew's gross income.

## II. The Business's Valuation

¶60 Drew challenges the trial court's determination that only 5% of the Business's value is attributable to his personal goodwill, and thus not distributable as part of the marital estate. Relatedly, he argues that the court's valuation resulted in impermissible double counting of his income.

### A. Personal Goodwill

¶61 Drew argues that the trial court misapplied Utah law when it determined that his personal goodwill constituted only 5% of

the Business's value. He asserts that the court "made up a test that involved numerous factors, never discussed by Utah law," and that if the court had properly considered Utah law, it "would have concluded that the [B]usiness's value was all, or almost all, Drew's non-divisible personal goodwill." But given the trial court's findings of fact related to goodwill—which Drew, who focuses on the court's legal analysis, has not challenged on appeal—we conclude that the trial court did properly apply Utah law to this case.

¶62    "Goodwill is the advantage acquired by an establishment, beyond the mere value of the capital, stocks, funds or property employed therein, in consequence of the general patronage it receives from habitual customers on account of its location, or local position or reputation for quality, skill, integrity or punctuality." *Peterson v. Jackson*, 2011 UT App 113, ¶ 35, 253 P.3d 1096 (quotation simplified). In simpler terms, "it is the probability that old customers will resort to the old place or seek old friends, and the likelihood of new customers being attracted to well advertised and favorably known services or goods." *Id.* (quotation simplified). *See Goodwill*, Black's Law Dictionary (12th ed. 2024) (defining goodwill, in part, as "the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets"). Utah recognizes two types of goodwill: personal and institutional. *Peterson*, 2011 UT App 113, ¶ 38; *Marroquin v. Marroquin*, 2019 UT App 38, ¶ 15, 440 P.3d 757. In divorce proceedings, one of the determinations a trial court must make when valuing a business for purposes of property distribution is whether the business's goodwill is personal or institutional. *Marroquin*, 2019 UT App 38, ¶ 15.

¶63    Personal (also known as "professional") goodwill is the "increased earning capacity that results from the reputation, knowledge and skills of individual people." *Peterson*, 2011 UT App 113, ¶ 38 (quotation simplified). *See Erickson v. Erickson*, 2022 UT App 27, ¶ 19, 507 P.3d 824 ("Personal goodwill is based on an individual's reputation for competency.") (quotation simplified). In other words, personal goodwill depends "on the earning

capacity of" an individual person. *Peterson*, 2011 UT App 113, ¶ 41. *See Moore v. Moore*, 779 S.E.2d 533, 544 (S.C. 2015) (stating that personal goodwill "depends on the continued presence of a particular individual") (quotation simplified). It "has computable value to the individual only to the extent that it promises increased future earnings." *Holbrook v. Holbrook*, 309 N.W.2d 343, 355 (Wis. Ct. App. 1981), *cited favorably by Sorensen v. Sorensen*, 839 P.2d 774 (Utah 1992). *See Sorensen*, 839 P.2d at 776 (stating that future earning capacity and personal goodwill "cannot be separated" because "future earning capacity comes in large part from goodwill and reputation"). Accordingly, personal goodwill is not subject to distribution as part of the marital estate. *Erickson*, 2022 UT App 27, ¶ 19. Otherwise, it would result in double counting. *Sorensen*, 839 P.2d at 776.

¶64 Conversely, institutional (also known as "enterprise") goodwill "attaches to a business entity and is associated separately from the reputation of the owners." *Peterson*, 2011 UT App 113, ¶ 38 (quotation simplified). It "is based on the intangible, but generally marketable, existence in a business of established relations with employees, customers and suppliers, and may include factors such as a business location, its name recognition and its business reputation." *Marroquin*, 2019 UT App 38, ¶ 15 (quotation simplified). "There can be no [institutional] good will in a business that is dependent for its existence upon the individual who conducts the enterprise and would vanish were the individual to die, retire or quit work." *Peterson*, 2011 UT App 113, ¶ 37 (quotation simplified). Unlike personal goodwill, institutional goodwill is divisible as part of the marital estate. *Erickson*, 2022 UT App 27, ¶ 19.

¶65 To further help distinguish between personal and institutional goodwill, a brief overview of some of the few Utah cases addressing this issue is helpful. In *Sorensen v. Sorensen*, 839 P.2d 774 (Utah 1992), the division of a sole practitioner's dental office was at issue in a divorce action. *Id.* at 775. Our Supreme Court held that "unless [a professional sole practitioner] retires and his practice is sold, his reputation should not be treated

differently from a professional degree or an advanced degree" because "both simply enhance the earning ability of the holder," *id.* at 776, and "because the goodwill of a sole practitioner is nothing more than his or her reputation for competency," *id.* at 775. Indeed, the Court could not "justify drawing a distinction between a party who holds an advanced degree that enables him or her to command a substantial salary and one who holds an advanced degree but has chosen to be self-employed and has earned a good reputation for skill and competence." *Id.* at 777. Sole practitioners are distinguishable from businesses consisting of a group of professionals because in the latter case, the goodwill does "not rest on the reputation of any one person" and "practitioners may come and go and the institution may have goodwill separate and apart from any one practitioner." *Id.* at 775.

¶66 In *Stonehocker v. Stonehocker*, 2008 UT App 11, 176 P.3d 476, this court clarified that personal goodwill is not limited to those holding professional degrees. *See id.* ¶ 43. At issue in that divorce action was the division of a used car dealership that the husband had formed. *Id.* ¶¶ 5, 40. The trial court ruled that the dealership was "in reality a sole proprietorship of Husband, dependent upon his personal professional reputation," *id.* ¶ 6, and that the dealership's goodwill was "solely attributable to Husband's personal, professional reputation," *id.* ¶ 43 (quotation simplified). In light of these findings, this court upheld "the trial court's decision to exclude goodwill from the calculation of [the dealership's] value."[19] *Id.* ¶ 44. In so ruling, this court stated that "there can be no [institutional] good will in a business that is dependent for its existence upon the individual who conducts the enterprise and would vanish were the individual to die, retire or quit work." *Id.* (quotation simplified).

---

19. This court did, however, remand to the trial court to enter more specific findings regarding the specific dollar value to be attributed to the car dealership. *See Stonehocker v. Stonehocker*, 2008 UT App 11, ¶ 44, 176 P.3d 476.

¶67 Similarly, in *Marroquin v. Marroquin*, 2019 UT App 38, 440 P.3d 757, this court held that a vending machine business, of which the husband was the sole employee, was akin to the car dealership at issue in *Stonehocker*. *Id.* ¶¶ 19–20. The trial court found that the business's goodwill was "*solely* attributable to [the husband's] work, his efforts, and his reputation for competency" because he was "the face of the business" and he had "personal relationships" with the owners of the properties on which the business placed its vending machines, allowing "him to continue to conduct business, largely on a month-to-month basis." *Id.* ¶ 18 (emphasis in original; quotation otherwise simplified). Based on those findings, this court held that the district court acted within its discretion when it did not attribute some value of the business to institutional goodwill. *Id.* ¶ 21.

¶68 In contrast, in *Erickson v. Erickson*, 2022 UT App 27, 507 P.3d 824, the trial court rejected a wife's contention that she should be attributed personal goodwill in her veterinary pharmaceutical business. *Id.* ¶¶ 3, 20. In so ruling, the trial "court concluded that [the business] was unlike sole proprietorships essentially run by one person—where the value of the company rests primarily on the work and professional reputation developed by the proprietor—given the number of [the business's] employees and the extent of its operations." *Id.* ¶ 21 (quotation simplified). In affirming the trial court's decision, this court noted that "there was no evidence to suggest that placing someone else in [the wife's] role would diminish the value of the company." *Id.* ¶ 22. To the contrary, the trial court "specifically found that it had not been provided any evidence from which it could draw the conclusion that her presence at the business, given the point to which it's grown, is essential for that business to continue given the number of employees and the extent of operations it has." *Id.* (quotation simplified).

¶69 Here, the trial court expressly rejected Drew's claim that "his personal relationships with the independent contractors, clients, and vendors are critical to the Business' success and irreplaceable," noting that it had not heard evidence that the

company the Business hired to manage ads or the independent contractors would refuse to continue working for the Business if Drew were no longer involved. Accordingly, this case is distinguishable from *Marroquin*, where the husband had personal relationships with the owners of the properties on which he placed the vending machines and with whom business was largely done on a month-to-month basis. *See* 2019 UT App 38, ¶¶ 18, 20. Moreover, although the trial court in this case acknowledged that the Business would be better off if run by an attorney, the court expressly rejected the proposition that the Business specifically depended on Drew's reputation for competency as an attorney. To the contrary, the court found that "the Business does not depend on [Drew's] reputation for competency to a significant or quantified degree." In so holding, the court pointed to the fact that Drew was not prominently featured on elh.com and that it was "highly likely that very few, if any," visitors to the website were even aware of Drew's involvement. The court also found that elh.com is "driven by web-based ads by website viewers that could be anywhere in the world and have no relationship with [Drew]—let alone even know his name."

¶70 More importantly, the court found, with our emphasis, that "the content of many of elh.com's web pages have remained *static* for many years, including specifically those web pages that were indicated to be generating the *most* ad revenues," and the court agreed with the conclusion offered by Megan's expert that any goodwill associated with elh.com "is inherent within the domain name and the historical content that has existed on the site since 2008." These findings indicate that the Business is well established and that its existence is not tied to Drew's future earning capacity or dependent on his continued presence. *See Peterson v. Jackson*, 2011 UT App 113, ¶ 41, 253 P.3d 1096 (stating that personal goodwill depends "on the earning capacity of" an individual); *id.* ¶ 37 ("There can be no [institutional] good will in a business that is dependent for its existence upon the individual who conducts the enterprise and would vanish were the individual to die, retire or quit work.") (quotation simplified); *Sorensen v. Sorensen*, 839

P.2d 774, 776 (Utah 1992) (stating that an individual's future earning capacity and personal goodwill "cannot be separated"); *Moore v. Moore*, 779 S.E.2d 533, 544 (S.C. 2015) (stating that personal goodwill "depends on the continued presence of a particular individual") (quotation simplified).

¶71 This conclusion is further supported by the court's finding that although Drew is the Business's sole employee, the Business's normal operation depends on contributions from consultants and independent contractors. Unlike, for example, the dental office at issue in *Sorensen* where the practice's sole dentist presumably employed a dental hygienist or at least a receptionist to perform tasks ancillary to the practice of dentistry, here, the consultants and independent contractors contributed to the Business in much the same manner as Drew did: by writing articles for elh.com. In fact, the trial court found that by the time of trial, Drew was no longer "the primary, or even secondary or tertiary, blog post author for elh.com"—he had authored only four blog posts in the past two years. The Business also employs an independent contractor who focuses on the consulting services the Business offers. And although Drew was and continues to be the only editor and is solely responsible for the website's design,[20] those functions are not what would create personal goodwill for the type of business at issue in this case. Thus, at least by the time of trial, the Business had reached a point at which it no longer "rest[ed] on the reputation of any one person." *Sorensen*, 839 P.2d at 775. *See Erickson*, 2022 UT App 27, ¶¶ 21–22 (affirming the trial court's conclusion that none of the veterinary pharmaceutical business's value was attributable to the wife's personal goodwill because, "given the number of . . . employees and the extent of its operations," the business's value did not rest "on the work and professional reputation developed by" the wife and "there was no

---

20. The court did, however, find that elh.com "has been developed over several years and only needs minor updates to pages or blog posts to maintain its web traffic," and that "[m]ost of these updates are currently out-sourced to independent contractors and not done by [Drew]."

evidence to suggest that placing someone else in [the wife's] role would diminish the value of the company") (quotation simplified).

¶72 Finally, in valuing the Business, the trial court made extensive findings and provided a thorough analysis explaining its conclusions. Specifically concerning the issue of personal goodwill, as summarized above, in addition to entering findings regarding the nature and operation of the Business, the trial court also provided seven pages of analysis in support of its conclusion that only 5% of the Business's value is attributable to Drew's personal goodwill. Thus, the court's findings are certainly "sufficiently detailed and include enough subsidiary facts to disclose the steps by which" the court reached its conclusion that only 5% of the Business's value is attributable to Drew's personal goodwill, which "is within the range of values established by all the testimony." *Rothwell v. Rothwell*, 2023 UT App 50, ¶ 49, 531 P.3d 225 (quotation simplified), *cert. denied*, 537 P.3d 1011 (Utah 2023).

¶73 For these reasons, the trial court's conclusions that most of the "goodwill associated with the Business is [institutional] goodwill" and that Drew's personal goodwill amounts to the "nominal value" of 5% of the Business's total value are in line with Utah precedent. The court therefore did not err as a matter of law in so ruling. In light of this, because the court's ultimate goodwill determination is supported by sufficiently detailed findings, the court's valuation of the Business did not constitute an abuse of discretion.

¶74 Drew resists this conclusion, arguing that the trial court erroneously relied on certain factors that have no basis in Utah law: burden, time, relationship with the end user, and practice. We address each of these arguments in turn.

¶75 **Burden.** In the initial findings of fact and conclusions of law, the trial court stated that Drew "has not met his burden as to personal goodwill." Based on this, Drew asserts that the court

erroneously placed the burden of establishing that the Business's goodwill *was not* institutional on him, when Megan should have carried the burden of showing that the goodwill *was* institutional. Alternatively, he asserts that "the question should be simply a factual finding for the court to make, independent of a 'burden.'" But based on our review of the trial court's goodwill analysis as a whole, we are not persuaded that the court squarely placed the burden of proof on Drew. Rather, the court viewed the issue in terms of Megan offering evidence in support of her position that the Business's goodwill was entirely institutional and Drew offering evidence in support of his stance that the goodwill was "largely or entirely" personal, the totality of which evidence the court considered when making findings concerning goodwill.

¶76   Throughout its analysis, the court addressed each party's assertions and whether the evidence supported those positions. For example, the court rejected Megan's contention that she "could run the Business as effectively as [Drew]" and it stated that the evidence did not support her position that she "had consistent or meaningful involvement in the Business operations or that she or anyone other than [Drew] has at any time exerted any control over the Business." The court next rejected Drew's contention that "his personal relationships with the independent contractors, clients, and vendors are critical to the Business' success and irreplaceable," and also on the ground that the evidence did not support such a finding. At a later point, the court also discussed various aspects of the testimony offered by Megan's expert leading to his ultimate conclusion that elh.com "is established and has intangible value distinct from any entity or any individual." The court stated that "this evidence was uncontroverted and weighs against personal goodwill." Accordingly, the court was not evaluating the evidence from the standpoint of Drew having the burden of disproving that the goodwill was institutional. Rather, it evaluated the evidence offered by both parties as a whole to determine whether the goodwill was institutional or personal.

¶77    Indeed, later in its findings, the court clarified its prior statement regarding Drew not having met his burden. The court stated, with our emphasis, that although it did "not believe, nor would it find, that there is zero personal goodwill, it was [Drew's] burden," as the party whose position it was that the goodwill was personal, "*to show an amount of personal goodwill*"—not that the goodwill was not institutional, as Drew asserts. Instead, Drew took the position at trial that the goodwill was "largely or entirely" personal, which conclusion the court stated was "wholly unsupported by the evidence." Thus, having been persuaded by Megan that the majority of the Business's goodwill was institutional, due to Drew's all-or-nothing trial strategy the court had no basis in evidence with which to determine what amount—other than the near-100% Drew advocated for at trial—to attribute to personal goodwill, which was the reason it originally attributed 0% to personal goodwill. And, following the second bench trial, the court amended this ruling, attributing the "nominal value" of 5% of the Business's total value to Drew's goodwill.

¶78    For these reasons, we disagree with Drew's premise that the court assigned him the burden of proving that the goodwill was not institutional.

¶79    **Time.** As part of its goodwill analysis, the trial court noted that Drew "spends very little time on elh.com." Drew argues that this was an improper consideration because "Utah law has never recognized 'time spent' as a factor in assessing goodwill." But the trial court made this observation in the context of considering to what extent the Business relies on Drew's reputation for competency. In addition to remarking on the amount of time Drew spent on elh.com, the court also noted that Drew was no longer a major contributor in terms of articles featured on elh.com—having authored only four articles in the two years prior to trial. Thus, the success of elh.com had, over time, become more reliant on articles contributed by independent contractors rather than by Drew himself. The court also considered that Drew was not prominently featured on elh.com and that it was "highly likely that very few, if any," website visitors were aware of Drew's

involvement. In light of all this, the trial court certainly did not base its decision on the amount of time Drew spent on elh.com but merely included it as one of many considerations when addressing the larger issue of whether the success of elh.com depended on Drew's reputation for competency. And in this context, we cannot say that the court improperly considered the amount of time Drew spent on the website.

¶80   **End User Relationship.** Also in the context of addressing whether the Business depended on Drew's reputation for competency, the trial court's initial findings of fact and conclusions of law included the following short paragraph:

> With respect to elh.com there is virtually no relationship with the end users that are driving revenue as it is driven by web-based ads by website viewers that could be anywhere in the world and have no relationship with [Drew]—let alone even know his name. This factor alone is dispositive in this matter.

Drew argues that a relationship with the end user is also not a factor recognized by Utah law, let alone a dispositive one. But following the second bench trial, the court stated that the last sentence of the paragraph "is not a correct statement" and directed that it be struck and replaced with a sentence indicating that the relationship with the end user is a factor that in this case weighs against a finding of personal goodwill. And this amendment to the findings did not alter the court's ultimate decision that only a nominal amount of the Business's goodwill was personally attributable to Drew. Thus, as with the time factor, we consider the propriety of this consideration as one of several made in the larger context of addressing Drew's reputation for competency.

¶81   In support of his contention that the relationship with the end user was an improper consideration, Drew points to

*Marroquin v. Marroquin*, 2019 UT App 38, 440 P.3d 757, in which the owner of the vending machine company did not have a relationship with those who made purchases from the vending machines but was nonetheless found to have personal goodwill in the company. *Id.* ¶ 18. We agree that the end-user consideration carried little weight in *Marroquin*. Instead, relevant relationships at issue in that case were the owner's relationships with the entities who owned the properties on which he placed the vending machines, which allowed the business to continue operating largely on a month-to-month basis. *Id.* ¶ 20. But in *Sorensen v. Sorensen*, 839 P.2d 774 (Utah 1992), the dentist's relationship with his patients played a significant role "because the goodwill of a sole practitioner is nothing more than his or her reputation for competency," *id.* at 775, and the party to which that reputation would matter is the patient of the dental practice. Likewise, in *Stonehocker v. Stonehocker*, 2008 UT App 11, 176 P.3d 476, the owner of the used car dealership dealt directly with the customers, to whom his "personal, professional reputation" would matter. *Id.* ¶ 43 (quotation simplified).

¶82 Accordingly, we cannot say, as a matter of law, that the relationship with the end user is a consideration that may never be taken into account in the goodwill context, and the trial court thus did not err as a matter of law by considering it—or, more precisely, the lack of it—in this case.

¶83 **Practice.** Drew contends that the trial court improperly considered whether the Business was a "practice." Specifically, the initial findings of fact and conclusions of law include the following discussion:

> The Business is not a "practice" within any meaning associated with the personal goodwill analysis. Indeed, [Drew] does not even currently "practice" law as that term would be defined in a goodwill analysis. . . . Also, analytically and legally, the

existence of some clients[21] does not render the
Business a solo practitioner "practice" for purposes
of personal goodwill.

Drew asserts that Utah law neither limits personal goodwill to
"practices" nor defines the term "practices." Although Drew is
correct that personal goodwill is not limited to "practices," *see
Stonehocker*, 2008 UT App 11, ¶ 44 (affirming the trial court's
allocation of personal goodwill to the owner of a used car
dealership), he misstates the purpose for which the court
addressed whether the Business was a "practice."

¶84    Immediately prior to the quoted excerpt, the court stated
that "[a]lthough [Drew] has a professional degree and that
professional degree does enhance the [B]usiness, this is not akin
to the *Sorensen* case with a sole practitioner professional and their
practice." In *Sorensen*, our Supreme Court stated that "the
goodwill of a sole practitioner is nothing more than his or her
reputation for competency," 839 P.2d at 775, and it could not
"justify drawing a distinction between a party who holds an
advanced degree that enables him or her to command a
substantial salary"—which degree is not subject to distribution as
part of the marital estate—"and one who holds an advanced
degree but has chosen to be self-employed and has earned a good
reputation for skill and competence," *id.* at 777. Here, because
Drew holds a law degree and the Business provides information
on employment law, the court felt it necessary to address whether
the Business constitutes a professional's solo practice, as was
addressed in *Sorensen*. If the answer to that question was in the
affirmative, the personal goodwill inquiry (at least the issue of
whether there is any) would end there in Drew's favor. But
because the court determined that the answer in this case was in
the negative, it continued to address other factors to determine
whether any of the Business's goodwill was attributable

---

21. This discussion of clients is in reference to the consulting side
of the Business, for which the Business employs an independent
contractor.

personally to Drew. The court in no way indicated that being a "practice" was a prerequisite to a finding of personal goodwill. The court thus did not err as a matter of law in first addressing whether the Business constituted a "practice."

### B.    Double Counting

¶85    As discussed above, personal goodwill is not subject to distribution as part of the marital estate because personal goodwill and future earning capacity—which is utilized in determining alimony awards—"cannot be separated." *Sorensen v. Sorensen*, 839 P.2d 774, 776 (Utah 1992). *See id.* ("Requiring defendant to divide with his wife the value of his reputation would not be an 'equitable division,' which is required by our statute, but would constitute 'double counting,' which is condemned in property division cases.").

¶86    Drew argues that the trial court's valuation of the Business is problematic because "[o]ne of its most fundamental building blocks is Drew's earning capacity, but Drew's earning capacity is already divided with Megan via the alimony and child support award[s]." But the trial court determined that only 5% of the Business's total value is attributable to Drew's personal goodwill, thus the equitable division of 95% of the Business's value will not result in double counting. To the extent that the court's adjustment of the personal goodwill determination from 0% to 5% affects the alimony award, the court should make any necessary adjustment on remand.

### CONCLUSION

¶87    The trial court misapplied the law when, for alimony purposes, it substituted the marital standard of living for the parties' individual financial needs. We therefore reverse the court's alimony award and remand the matter for the court to enter findings regarding the parties' reasonable expenses and to reassess alimony based on those findings. We otherwise affirm

the court's rulings regarding child support, the parties' incomes, and the percent of the Business's value attributed to Drew's personal goodwill.

———————